IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DIANA ARUTINOVA, and
EDGAR MANUKIAN,

        Plaintiffs,

v.                      No. CIV 06-0763 WJ ACT

THE UNITED STATES OF AMERICA,
JARRELL W. "JAY" PERRY,
a United States Drug Enforcement Administration Special Agent,
DAVID SMITH,
a United States Drug Enforcement Administration Special Agent, and
JOHN E. CLAYBORNE
a United States Drug Enforcement Task Force Officer,
each in their individual capacities,

                              <u>JURY TRIAL DEMANDED</u>

        Defendants.

### <u>COMPLAINT FOR DAMAGES TO REMEDY FEDERAL CIVIL RIGHTS VIOLATIONS AND COMMON LAW TORTS</u>

Plaintiffs Diana Arutinova and Edgar Manukian bring this Complaint pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680, and under the Fourth and Fifth Amendments to the United States Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for damages resulting from constitutional and common law torts.

### JURISDICTION AND VENUE

1. This court has jurisdiction pursuant to 28 U.S.C. §§ 1343 and 1346(b)(1). Ms. Arutinova and Mr. Manukian have properly and timely exhausted their administrative remedies under the FTCA, and this action is timely filed. Venue is proper because the acts complained of occurred exclusively in New Mexico.



## PARTIES

2. Plaintiff Diana Arutinova is a citizen of the Republic of Georgia, a Permanent Resident Alien in the United States, and a resident of Burbank, California.

3. Plaintiff Edgar Manukian is a citizen of the Republic of Georgia, a Permanent Resident Alien in the United States, and a resident of Burbank, California.

4. At all times material to the allegations in the complaint, Defendant Jarrell W. "Jay" Perry was employed by the United States Drug Enforcement Administration (DEA) as a special agent.

5. At all times material to the allegations in the complaint, Defendant David Smith was employed by the DEA as a special agent.

6. At all times material to the allegations in the complaint, Defendant John E. Clayborne was employed by the DEA as a task force officer.

7. Defendant United States of America is the party subject to suits arising from the wrongful acts of federal employees acting in the scope of their office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act occurred.

## ALLEGATIONS PERTINENT TO ALL COUNTS

8. On August 17, 2005, Mr. Manukian bought two tickets, one for himself and one for Ms. Arutinova, on the Amtrak web site, paying with a credit card. The tickets were for travel starting the following day, one way from Los Angeles, California, to Denver, Colorado. Mr. Manukian and Ms. Arutinova intended to travel from Los Angeles to Raton, New Mexico, by train, and from Raton to Denver by bus.

9. On August 17, 2005, Mr. Manukian also bought two tickets, again for himself and Ms. Arutinova, on the Southwest Airlines web site for the return trip from Denver to Burbank,

2

California, on August 21, 2005.

10. Upon information and belief, there is a DEA task force in Albuquerque, New Mexico that reviews Amtrak ticket purchase records and uses the information it obtains from those records to target certain passengers for questioning and search when the train stops at the Albuquerque station.

11. On August 18 and 19, 2005, Ms. Arutinova and Mr. Manukian were passengers on the Amtrak Southwest Chief 4, a train traveling from Los Angeles to Denver, in car 0430, sleeping roomette 12.

12. On August 19, 2005, at around 2:30 PM, their train stopped in Albuquerque for approximately forty minutes.

13. Ms. Arutinova and Mr. Manukian left the train briefly to stretch their legs and look at the things for sale on the train platform.

14. After ten to fifteen minutes, Ms. Arutinova and Mr. Manukian reboarded the train and returned to their roomette.

15. At around 3:00 PM, Agent Smith knocked on the roomette door.

16. Agent Smith asked for Plaintiffs' identification and tickets and asked Mr. Manukian whether they had any luggage in the luggage area. Mr. Manukian replied that they did.

17. Agent Smith instructed Mr. Manukian to follow him to the luggage area. Mr. Manukian complied, and Ms. Arutinova followed as well.

18. During the walk down the hall, Agent Smith asked Mr. Manukian whether he and Ms. Arutinova were carrying anything illegal, including guns, bombs, or drugs. Mr. Manukian truthfully replied that they were not.

19. Agent Smith told the Ms. Arutinova and Mr. Manukian that they were "suspicious."

20. When the Agent Smith, Mr. Manukian, and Ms. Arutinova arrived at the luggage

area of the train car, they were joined by Agent Perry and Agent Clayborne.

21. Agent Smith asked which bags belonged to Ms. Arutinova and Mr. Manukian.

22. Mr. Manukian pointed out their two bags.

23. Agent Smith said that he needed to search the bags.

24. Mr. Manukian asked why, and Agent Smith said that they search everyone's luggage.

25. When Mr. Manukian stated that they had nothing illegal in their bags, Agent Perry became belligerent, yelling at Mr. Manukian and insisting that he allow them to search the bags.

26. Intimidated and feeling that he had no choice, Mr. Manukian pulled the two bags down and set them on the floor.

27. Agent Smith and Agent Perry then searched the bags while Agent Clayborne guarded the exit.

28. Agent Smith rifled through the smaller of the two bags containing Ms. Arutinova's and Mr. Manukian's shoes, pulling out each shoe and twisting it roughly and unnecessarily. Mr. Manukian asked Agent Smith not to damage their belongings. Agent Smith ignored the request and continued in the same manner.

29. Turning to the next bag containing Ms. Arutinova's and Mr. Manukian's clothes, Agent Smith removed each article in turn and tossed it on the floor.

30. Agent Smith removed a small bag containing Ms. Arutinova's bras and underwear. While Ms. Arutinova and Mr. Manukian watched, Agent Smith pulled out each bra and pair of underwear one by one, examining them with an exaggerated smile.

31. Mr. Manukian asked Agent Smith what he was doing and told him that the bag contained Ms. Arutinova's personal things.

32. Agent Smith responded, "Oh, really? I didn't know," and continued in the same

4

manner, with a lascivious smile directed at both Mr. Manukian and Ms. Arutinova.

33. Agent Perry and Agent Clayborne joined in, laughing, making coarse remarks, and addressing Mr. Manukian and Ms. Arutinova with inappropriate epithets, such as "asshole" and "bitch."

34. When Agent Smith was finished with his search, all of Mr. Manukian's and Ms. Arutinova's clothing and shoes were on the floor of the train.

35. Picking up their things, Mr. Manukian said, "That's it." Agent Clayborne responded by asking whether Mr. Manukian was going to let them finish searching.

36. After putting their belongings back into their bags, Mr. Manukian requested defendants' names and badge numbers, and asked for the names of their "watch commanders." In response, Agent Perry became extremely angry.

37. Agent Perry pushed Mr. Manukian toward the train door and said, "You want my name? What are you gonna do about it, asshole?" He then threw his business card at Mr. Manukian.

38. Agent Perry jabbed Mr. Manukian and grabbed him by the arms. In response to Mr. Manukian's request that he stop, Perry became irate and moved toward Mr. Manukian.

39. Frightened by Agent Perry's attack on Mr. Manukian, Ms. Arutinova stepped between them.

40. Agent Perry grabbed Ms. Arutinova's right arm, pushed her against the wall, and shook her so hard that her head struck the wall.

41. Agent Perry dragged Ms. Arutinova by the arm back down the hall toward the roomette. He continued to shake her violently, such that her head struck the wall two or three more times. He stopped only when Ms. Arutinova began to scream.

42. Leaving Ms. Arutinova in front of the roomette, Agent Perry returned to the luggage

area, and all three defendants exited the train.

43. Agent Perry had used so much force when he grabbed Ms. Arutinova that her right arm hurt and was discolored. Ms. Arutinova and Mr. Manukian decided they should take a picture of her arm.

44. The couple stepped out onto the platform where the light was better, and Mr. Manukian took a photograph of Ms. Arutinova's arm. He noticed that all three of the defendants were there, walking away.

45. Mr. Manukian took one or two photographs of Agents Perry and Smith, and Task Force Officer Clayborne.

46. One of the defendants glanced back and noticed Mr. Manukian taking photographs, and all three defendants turned around and walked back toward Mr. Manukian and Ms. Arutinova.

47. Agent Perry yelled at Mr. Manukian, "What the hell are you doing taking pictures of us? Give me that camera!," as Agent Perry grabbed Mr. Manukian's arm. Ms. Arutinova took the camera from Mr. Manukian and stuck it in the back of her waistband.

48. Agent Perry then moved within inches of Ms. Arutinova and shouted, "Give me the camera!"

49. Ms. Arutinova responded, "It's my camera. I'm not giving it to you," and stepped back, pressing her back against the train. While Agent Perry was standing in front of her, Agent Smith reached behind her and grabbed the camera out of her waistband.

50. Agent Smith touched Ms. Arutinova in the process of snatching the camera.

51. Mr. Manukian demanded that they return the camera as Agents Perry and Smith, and Task Force Officer Clayborne fled into the train station, but the three defendants ignored him and took the camera with them.

52. Ms. Arutinova's arm took about two weeks to heal. During that time, she was in pain and was unable to fully use her arm.

53. Ms. Arutinova also suffered from headaches, nightmares, insomnia, and anxiety for several weeks.

54. Ms. Arutinova, whose responsibilities as a phlebotomist required her to use her right arm to draw blood from her patients, was unable to work during this time because her arm injury prevented her from using her right arm, and because of the insomnia, anxiety, and emotional distress she suffered as a result of her encounter with Defendants Perry, Smith, and Clayborne.

55. Ms. Arutinova was unable to take the time off she needed to recover, and she was forced to quit her job.

56. Ms. Arutinova was unable to take a new job until October 2005.

57. As a direct and proximate result of defendants' conduct set forth above, Ms. Arutinova and Mr. Manukian suffered physical and psychological injuries for which they are entitled to compensation.

## COUNT I
## RETALIATION FOR PROTECTED SPEECH—FIRST AMENDMENT
### (PERRY and SMITH)

58. Ms. Arutinova and Mr. Manukian reallege the allegations in paragraphs 1-57.

59. Mr. Perry's and Mr. Smith's actions against Ms. Arutinova and Mr. Manukian (set forth above) were in retaliation for Ms. Arutinova's and Mr. Manukian's speech in opposition to Mr. Perry's and Mr. Smith's unlawful conduct toward Ms. Arutinova and Ms. Manukian, in violation of the First Amendment to the United States Constitution.

7

## COUNT II
## EXCESSIVE FORCE—FOURTH AMENDMENT
## (PERRY and SMITH)

60. Ms. Arutinova and Mr. Manukian reallege the allegations in paragraphs 1-59.

61. As described above in the body of the complaint, and in the FTCA counts, Perry used excessive force against Ms. Arutinova during and after the unlawful search, in violation of Ms. Arutinova's Fourth Amendment right to be free from the use of excessive by law enforcement officers.

62. As described above in the body of the complaint, and in the FTCA counts, Mr. Perry used excessive force against Mr. Manukian during and after the unlawful search, in violation of Mr. Manukian's Fourth Amendment right to be free from the use of excessive by law enforcement officers.

63. As described above in the body of the complaint, and in the FTCA counts, Mr. Smith used excessive force against Ms. Arutinova during and after the unlawful search, in violation of Ms. Arutinova's Fourth Amendment right to be free from the use of excessive by law enforcement officers

## COUNT III—UNREASONABLE SEARCH AND SEIZURE OF PROPERTY
## FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION
## (PERRY and SMITH)

64. Ms. Arutinova and Mr. Manukian reallege the allegations in paragraphs 1-63.

65. Mr. Perry and Mr. Smith violated Ms. Arutinova's and Mr. Manukian's Fourth Amendment right to be free from unreasonable searches of their property by searching their luggage without either reasonable suspicion or probable cause to believe that they had committed any crime and without reasonable suspicion or probable cause to believe that their luggage contained any contraband or evidence of criminal activity.

66. Mr. Smith violated Ms. Arutinova's and Mr. Manukian's Fourth Amendment rights

8

to be free from unlawful seizure of their property by seizing Ms. Arutinova's and Mr. Manukian's camera without probable cause.

## COUNT IV
## CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS
## (PERRY, SMITH, and CLAYBORNE)

67. Ms. Arutinova and Mr. Manukian reallege the allegations in paragraphs 1-66.

68. Mr. Perry, Mr. Smith, and Mr. Clayborne acted in concert throughout the incident.

69. Mr. Perry, Mr. Smith, and Mr. Clayborne agreed with each other, through words and conduct, to engage in the acts described herein, which violated Ms. Arutinova's and Mr. Manukian's constitutional rights.

## COUNT V
## BATTERY—FEDERAL TORT CLAIMS ACT
## (PERRY)

70. Ms. Arutinova and Mr. Manukian reallege the allegations in paragraphs 1-69.

71. Defendants do not have immunity from this claim because the Federal Tort Claims Act waives immunity for law enforcement officers.

72. Mr. Perry battered Mr. Manukian by pushing, jabbing, and grabbing Mr. Manukian by the arms after he requested the defendants' names, their badge numbers, and the name of their supervisor.

73. Mr. Perry battered Ms. Arutinova by grabbing her arm, pushing her against the wall, and banging her head against the wall multiple times.

74. Mr. Perry battered Mr. Manukian by grabbing his arm while demanding that he give up the camera.

## COUNT VI
## ASSAULT—FEDERAL TORT CLAIMS ACT
## (PERRY)

75. Ms. Arutinova and Mr. Manukian reallege the allegations in paragraphs 1-74.

9

76. The defendants do not have immunity from this claim because the Federal Tort Claims Act waives immunity for law enforcement officers.

77. Mr. Perry assaulted Ms. Arutinova by stepping within inches of her, forcing her to press her back against the train, and demanding that she give up the camera. Mr. Perry's actions caused Ms. Arutinova, whom Mr. Perry had just grabbed, shaken, and slammed against the wall inside the train, to reasonably fear that Mr. Perry would strike, grab, or touch her again in an offensive and unwanted manner.

## COUNT VII
## CONVERSION—FEDERAL TORT CLAIMS ACT
## (SMITH)

78. Ms. Arutinova and Mr. Manukian reallege the allegations in paragraphs 1-77.

79. Mr. Smith converted Mr. Manukian's camera when he took possession of it and failed to return it when Mr. Manukian demanded that he do so.

80. As a direct and proximate result of Mr. Smith's conduct set forth above, Ms. Arutinova and Mr. Manukian lost their personal property for which they are entitled to be compensated.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Arutinova and Mr. Manukian respectfully request that the Court enter judgment in their favor, including:

    1.    compensatory damages against the defendants in an amount sufficient to make up for all of the harm that the defendants' unlawful conduct caused, including medical expenses, the cost of the camera, lost wages, and physical and psychological injuries;

    2.    punitive damages against the defendants for their malicious, wanton, willful, reckless, and knowing violation of Ms. Artinova's and Mr. Manukian's

constitutional rights under the First Amendment and Fourth Amendment in an amount sufficient to deter the defendants and other law enforcement officers from violating the constitutional rights of others;

3. attorneys' fees and costs of suit;

4. a jury trial on all issues so triable;

5. any further relief the Court deems just and proper.

>Respectfully submitted,
>
>Zachary A. Ives
>Martha E. Mulvany
>Freedman Boyd Daniels
>Hollander Goldberg & Ives, P.A.
>Cooperating Attorneys for the New
>Mexico Civil Liberties Foundation
>20 First Plaza, Suite 700
>Albuquerque, NM 87102
>505.842.9960
>Facsimile 505.842.0761
>
>FILED ELECTRONICALLY 11/13/06
>
>_____
>George Bach
>Staff Attorney
>ACLU of New Mexico
>P.O. Box 566
>Albuquerque, NM 87103-0566
>(505) 243-0046
>Facsimile (505) 266-5916
>
>Philip B. Davis
>Co-Legal Director for the New Mexico
>Civil Liberties Foundation
>814 Marquette N.W.
>Albuquerque, N.M. 87102
>(505) 242-1904
>Facsimile (505) 242-1864
>Of Counsel
>
>Counsel for Diana Arutinova and
>Edgar Manukian

CERTIFICATE OF SERVICE

I certify that the foregoing was served by U.S. mail this 13th day of November 2006 upon Elizabeth Martinez, Assistant U.S. Attorney.

FILED ELECTRONICALLY 11/13/06

_____
George Bach