**III.    THE EVIDENCE PRESENTED AT THE HEARING DEMONSTRATES THAT DEFENDANT GROBSTEIN'S CONSENT TO AGENT PERRY'S SEARCH OF HIS BELONGINGS WAS INVOLUNTARY**

The United States bears the burden of demonstrating that the consent that SA Perry obtained from Mr. Grobstein to search his bag, and ultimately his jacket, was indeed voluntary. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792 (1968) (holding that if the prosecutor "seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given"). District courts are to "careful[ly] sift[ ] the unique facts and circumstances of each case" to determine whether an individual voluntarily consented to a search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

The Tenth Circuit has developed non-exhaustive factors that courts can consider when assessing whether an individual's consent in any given case was voluntary. They are

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of a person's personal effects; (6) a request to accompany the officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

*United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010).

In this case, Mr. Grobstein was well aware that multiple officers were on the bus soon after he boarded it. Before encountering SA Perry, Mr. Grobstein had to push past TFO Walsh– who was obstructing the aisle–and speaking to Juan Braxton. [II Tr. 161:6-22, 162:1-2] Later on, as Mr. Grobstein's encounter with SA Perry progressed, he was acutely aware that Juan Braxton was being arrested by TFO Walsh. [II Tr. 168:2-8]. Hence, the presence of multiple

law enforcement officers was readily apparent to Mr. Grobstein on the cramped confines of the Greyhound bus.

As Mr. Grobstein passed TFO Walsh and began to approach his seat, Mr. Grobstein noticed SA Perry "staring directly at me." [II Tr. 162:3-7]. Mr. Grobstein tried to ignore SA Perry, but as Mr. Grobstein began to sit down, SA Perry stopped him by patting him on the shoulder. [II Tr. 162:9-12] *United States v. Abdenbi*, 361 F.3d 1282, 1292 (10th Cir. 2004) (observing that the physical touching would weigh against a finding of voluntariness). SA Perry asked to speak to Mr. Grobstein, and Mr. Grobstein agreed to do so. [II Tr. 162:15] Despite all of the people getting on the bus and locating their seats at this time, [II Tr. 161:9-12], the only two people being questioned on the bus by law enforcement officers at that moment were Juan Braxton and Mr. Grobstein.

SA Perry identified himself as a law enforcement officer, and, among other questions about his travel, asked Mr. Grobstein for his identification. SA Perry stood within arm's length of Mr. Grobstein. [II Tr. 164:15-18] Mr. Grobstein retrieved his United States Passport from a shopping bag that he had left on the seat of the bus and handed it to SA Perry. [II Tr. 162:24-25, 163:1] During this time, SA Perry's voice was at a normal volume, but his tone intimidating, and manly. [II Tr. 164:18-24]

When his perfunctory questions were finished, SA Perry then asked Mr. Grobstein if SA Perry could search his bag. Mr. Grobstein said no. [II Tr. 163:8-10] SA Perry explained to Mr. Grobstein that he was on the bus for security purposes, and asked again to search Mr. Grobstein's bag. [II Tr. 163:11-15] Mr. Grobstein said that he did not want his bag searched, because Mr. Grobstein did not want his belongings messed up. [II Tr. 163:19-21] SA Perry then explained to Mr. Grobstein that his concerns were not reasonable, that the contents of his bag

would not be messed up, and insisted that Mr. Grobstein allow him to search his bag. [II Tr. 165:10-21]

At this moment, Mr. Grobstein realized that given SA Perry's tone and his persistent insistence that he be allowed to search Mr. Grobstein's bag, Mr. Grobstein could say "No" as "many times as I wanted," but that SA Perry would not accept "No" for an answer. [II Tr. 167:9-14, 176:5-9] Mr. Grobstein understood at that moment that SA Perry "wouldn't listen to me." [II Tr. 165:1-2] Feeling that he had no true choice in the matter, Mr. Grobstein relented, and opened up his bag for SA Perry to search through. [II Tr. 165:5-8]

Mr. Grobstein's consent to search his bag, however, was not absolute. While they were speaking, Mr. Grobstein was facing SA Perry (and the rear of the bus), and his blue suitcase was on the seat to his right. After opening his bag so SA Perry could examine it, Mr. Grobstein removed his jacket from the top of the bag, and placed it over his left arm, and waived with his right hand for SA Perry to search the bag. [II Tr. 166:15-19] Mr. Grobstein removed his jacket from his suitcase because he did not want SA Perry to search it. *Id*.

SA Perry admitted that his interest was not in the blue suitcase at all, but instead on searching Mr. Grobstein's jacket. [I Tr. 176:12-16] SA Perry basically ignored the blue suitcase and asked Mr. Grobstein to search the jacket. *Id*. By this point, Mr. Grobstein did not think, given SA Perry's repeated refusals to honor his right to say no, that SA Perry would have accepted no for an answer. [II Tr. 167:10-14] So Mr. Grobstein handed SA Perry his jacket, which contained in its interior a package of MDMA bundled in cardboard and vacuum wrap as shown in Exhibits A, B & C. SA Perry then arrested Mr. Grobstein.

"In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973). In this case, SA Perry, who was at the time a 14 year veteran of the Drug Enforcement Agency,[1] encountered Mr. Grobstein, a slight, 23 year old male who weighed approximately 110 pounds, on a crowded Greyhound bus. Even though Mr. Grobstein tried to avoid SA Perry, it was apparent to Mr. Grobstein that SA Perry was focused directly on him as he approached his seat. While Mr. Grobstein attempted to be polite, and answer SA Perry's questions, he repeatedly refused to allow SA Perry to search his bag.

A subtly coercive tactic that SA Perry employed, when Mr. Grobstein informed him for the second time that he did not want his bag searched because SA Perry would mess up his things, was to tell Mr. Grobstein that he was there for "security purposes." [II Tr. 163:13-15] Yet, even the United State has admitted that SA Perry is not a security officer, and that his self-described role as such constitutes a "lack of candor." *See United States v. Billie Tiea Vaughn*, U.S.D.N.M. No. 11-CR-01235 MCA, Doc. No. 41, p. 11. Most objective individuals think, as the record in *Billie Tiea Vaughn* shows, that security officers are related to anti-terrorism work in our post September 11, 2001 world. *Id*., Doc. 41, p. 4, ¶ 24 (responding to SA Perry's claim that he was a security officer that "well, that's good actually, that you all are doing this since nine eleven"). Hence, SA Perry's failure to alert Mr. Grobstein that SA Perry's real purpose for being on the bus was to discover illegal narcotics is a factor the Court should consider, and weigh, against the United States when assessing voluntariness. *Id*, Doc. No. 41, p. 4, ¶ 25.

---

[1]   The United States described SA Perry as a "big, strong weight-lifter guy." [II Tr. 142:20-22].

But the real factor that makes Mr. Grobstein's consent here involuntary is the persistence with which SA Perry pursued the issue.  It is well established in this Circuit, that "accusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one."  *United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir. 2003).  Mr. Grobstein was aware that SA Perry was keenly "staring directly" at him as he arrived on the bus.  [II Tr. 162:4-5]  His subjective outlook is objectively supported by the evidence in this case, evidence that shows SA Perry getting up out of his seat and moving forward in the bus to station himself near Mr. Grobstein's seat as Mr. Grobstein leaves the bus station to board the bus.  *See, e.g*, Photo 36.  As Mr. Grobstein testified that "I could have said no as many times as I wanted, I didn't think Agent Perry would accept that as an answer." [II Tr. 176:5-9].

Under the circumstance presented here, it was imperative for SA Perry to have alerted Mr. Grobstein that Mr. Grobstein had a very real right to refuse SA Perry's request to search his luggage.  While law enforcement officers are not bound to provide notice of the right to refuse consent, it is a factor the court should consider and weigh against the voluntariness of Mr. Grobstein's purported consent, especially in light of Agent Perry's repeated requests to search Mr. Grobstein's bag.  *United States v. Hill*, 199 F.3d 1143, 1149 (10th Cir. 1999) (affirming consent to search because the totality of the circumstances included an "explicit advisement that Mr. Hill need not consent to a search of his luggage").

The Supreme Court's holding in *United States v. Drayton*, 536 U.S. 194, 197 (2002), does not assist the prosecution here.  *Drayton* noted that the "Fourth Amendment permits police officers to approach bus passengers *at random* to ask questions and to request their consent to searches."  *Id*. (emphasis added).  As the evidence in this case shows, there was nothing *random* about this encounter at all.  SA Perry was waiting patiently for Mr. Grobstein to board the bus so

39

he could specifically ask to search his bag. Even Michael O'Beirne, the fellow passenger, testified that these two officers "knew what they were looking for and where it was" . . . "they just needed to put a face to that area." [II Tr. 152:1-6] While *Drayton* addressed whether "consent to the *suspicionless* search was involuntary," 536 U.S. at 206, the encounter here was directed in its entirety by evidence obtained in violation of the Fourth Amendment. Here, the entire encounter must be assessed through the lens of the SA Perry's coercive need to gain entry into Mr. Grobstein's bag to effectuate his arrest. Hence, Mr. Grobstein's view that SA Perry was not going to take no for an answer has a basis in fact that should be candidly acknowledged. And under these circumstances, not only was SA Perry's dogged persistence to gain access to Mr. Grobstein's luggage, and ultimately his jacket, unfairly coercive, but his failure to alert Mr. Grobstein about his right to say no to the searches takes on a more prominent role. *Drayton*, 536 U.S. at 207 (observing that there are no *per se* rules when analyzing the totality of the circumstances when evaluating consent) (emphasis in original).

     In sum, SA Perry had targeted Mr. Grobstein to be searched, using physical touch to halt his progress to his seat. While speaking in a normal volume, his manly and intimidating tone and his insistence that he be allowed to search Mr. Grobstein's bag–in his faux capacity as serving "security purposes"– overwhelmed what was an unequivocal denial of consent. By ignoring Mr. Grobstein's constitutional efforts to refuse consent to search, and refusing to advise him of the same, SA Perry overrode Mr. Grobstein's initial refusals to search his effects. In so doing, the eventual consent to search his bag and jacket that SA Perry obtained had become, as a matter of law, involuntary. When accounting for the "subtly coercive" tactics employed here, "as well as the possibly vulnerable subjective state of the person who consents" *Schneckloth*, 412 U.S. at 229, this Court should find Mr. Grobstein's consent to search was involuntary.

IV.   **ALL EVIDENCE OBTAINED PURSUANT TO THE ILLEGAL GOVERNMENT ACTIVITY PRESENTED AT THE HEARING CONSTITUTES "FRUIT OF THE POISONOUS TREE," WARRANTING SUPPRESSION**

   A.   **When consent follows an illegal search, the United States bears a high burden to overcome suppression of the evidence.**

The exclusionary rule separates police conduct demonstrating deliberate exploitation or systemic abuse from simple mistakes or officer negligence.  *See United States v. Martinez*, 696 F. Supp. 2d 1216, 1238 (D.N.M. 2010) *aff'd,* 643 F.3d 1292 (10th Cir. 2011).  The United States has explained the rule and the deterrent effect it aims to achieve in the following way:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring v. United States,* 555 U.S. 135, 136 (2009).  When police conduct falls into the first category of deliberate misconduct or systemic abuse, the exclusionary rule is implicated, as "calculated to prevent [future such misconduct], not to repair.  Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."  *Elkins v. United States*, 364 U.S. 206, 217 (1960).  While "[i]t is of course true that the exclusionary rule exerts a high price—the loss of probative evidence of guilt, . . . that price is one courts have often been required to pay to serve important social goals." *United States v. Leon,* 468 U.S. 897, 979 (1984) (Stevens, J., concurring and dissenting).

As in the present case, once a Fourth Amendment violation has occurred, the United States carries a high burden to avoid suppression of the contraband found as a result of that

violation—or, the fruit of the poisonous tree. In the context of a purported consensual search that follows a Fourth Amendment violation, the United States must establish that consent is voluntary in fact, in addition to establishing "a break in the causal connection" between the underlying illegality and consent. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994)  The United States has not met this high burden here.

> B.     **Application of *Brown v. Illinois***

The Tenth Circuit considers the three *Brown v. Illinois*, 422 U.S. 590 (1975) factors to determine whether any consent was tainted by a constitutional violation. The *Brown* factors are: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *Melendez-Garcia*, 28 F.3d at 1054.

Importantly, "consent that is voluntary in fact is [not] in itself an intervening act that purges any police illegality." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994):

> While there is a sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible **only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality**.

LaFave, 3 Search and Seizure § 8.2(d) at 190 (citation omitted) (italicization in original; additional emphasis added)

> 1. <u>Under the first *Brown* factor, SA Perry's encounter with Mr. Grobstein was premised upon unlawfully obtained evidence, resulting in an unlawful seizure of Mr. Grobstein immediately before his consent for the search of his bag; therefore, the temporal proximity is almost immediate</u>

While the facts of this case demonstrate that Mr. Grobstein's consent was involuntarily given, it is important for the Court to assess any alleged consent that Mr. Grobstein provided to SA Perry to search his luggage under the appropriate legal framework. Mr. Grobstein contends that his encounter with Agent Perry should be analyzed in the context of a police-citizen encounter under *Terry v. Ohio*, 392 U.S. 1, 27 (1968), applying a reasonable suspicion standard, and not a consensual encounter as the United States would have the Court believe. While this analysis is also relevant to the second question that the Court asked the parties to brief–whether Mr. Grobstein was targeted as the result of illegal government activity–it overlaps with the fourth question as well. Mr. Grobstein contends that he was unlawfully seized for Fourth Amendment purposes right before he purportedly consented to a search of his bag.

TFO Walsh testified at the hearing that law enforcement officers, including himself and SA Perry, investigate bags on the Greyhound buses when they are in the wash bay of the bus station, where the bus is serviced. TFO Walsh and SA Perry examine luggage in the wash bay because "it is away from the passengers" and they do not want the owners of the bags to know that law enforcement officers are examining their belongings. [I Tr. 48:1-16] TFO Walsh and SA Perry use at least two methods of investigation to interdict illegal drugs on the Greyhound bus, one of which is to have TFO Walsh's canine to sniff bags and alert to any drugs that may be in the luggage that had been placed on the bus. [I Tr. 217:13-18] TFO Walsh and SA Perry also manipulate luggage in a fashion that they refer to as "burping" or prepping. [I Tr. 218;24-25, 219:1-21, II Tr. 31:19-25]

It is undisputed that SA Perry's and TFO Walsh's interdiction efforts began before SA Perry's encounter with Mr. Grobstein. SA Perry or TFO Walsh never indicated during their hearing testimony that there was any sort of break in their drug interdiction efforts from the time they arrived at the Greyhound station until the time the arrested Mr. Grobstein and Mr. Braxton. The Greyhound surveillance footage captures almost every second of SA Perry's and TFO Walsh's movement from their arrival at the station on, which demonstrates a seamless, hour long, process.

Once SA Perry and TFO Walsh get a hit on a bag using either one of these two interdiction techniques, they do not allow the owner of the bag to know about their findings. Instead, they "place the bag back on the bus and then conduct consensual encounters with the passengers." [I Tr. 220:21-25] This law enforcement tactic is purposefully done "away from the passengers," [I Tr. 48:1-16], in order allow law enforcement to pretend that a particular police-citizen encounter is "consensual" when, in fact, the entirety of the encounter is an exploitation of the illegally obtained evidence that associates criminal activity with a piece of luggage.

Both SA Perry and TFO Walsh claim to have encountered Mr. Grobstein and Juan Braxton, the other individual arrested, during random consensual encounters that night when the passengers began re-boarding the bus. Neither passenger had any idea that SA Perry and TFO Walsh had just spent the last hour thoroughly searching the bus, and the luggage inside it, and conferring with Greyhound employees.

TFO Walsh was candid about their general approach to getting purported consent. If he obtained evidence that any particular bag contained contraband using either one of these

procedures, it would provide reasonable suspicion that the bag had illicit substances inside it.[2]
[II Tr. 30:21-25, 31:1-25, 32:1-8]  That same degree of suspicion would ultimately fall on upon "the individual that came to claim that bag." [II Tr. 32:1-8]  In other words, the police-citizen encounters that SA Perry and TFO Walsh describe in their reports as "consensual encounters," were actually precipitated by unlawfully gathered evidence amounting to, at a minimum, illicit reasonable suspicion.  Because Mr. Grobstein's encounter with SA Perry was the result of such ill-gained suspicion, it was, at its inception, an illicit *Terry* stop.  The time between Mr. Grobstein's unlawful seizure and any purported consent to search was a matter of minutes at best.[3]

> 2. Under the third *Brown* factor, SA Perry and TFO Walsh's illegal conduct was purposeful and flagrant, and included applying a purported constitutional veneer of a "consensual encounter" over their unconstitutional pre-searching activities.

"The Supreme Court in *Brown* made clear that purging the taint of an illegal arrest requires an analysis beyond merely determining whether the consent was voluntary." *Melendez-Garcia*, 28 F.3d at 1055 (discussing *Wong Sun* and noting that "an important question in determining whether evidence is tainted is if police have exploited the illegal search or seizure to obtain the evidence.").  This case is a perfect example of systemic police misconduct that exploits the fruit of the initial illegal acts.

---

[2] The evidence obtained in this manner would be illegal, because would have been obtained as the result of manipulation of and trespass upon the luggage.  "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *United States v. Jones*, 132 S. Ct. 945, 950-51, n. 3 (2012)).

[3] Given the temporal proximity between the illegal seizure of Mr. Grobstein and his purported consent to search, no intervening circumstances exist under the second *Brown* factor.

As discussed above, SA Perry and TFO Walsh routinely exploited their unconstitutional findings by using that knowledge and targeting individuals for purported suspicionless consent searches. After the Supreme Court's 2000 decision in *Bond*, and especially after the court's 2012 decision in *Jones*, none of these tactile search methods on passengers' luggage can be considered remotely constitutional, much less performed in good faith. The entire scheme employed by these two officers was, by design, deceitful, and worked a fundamental injustice on the citizens of this Country, including Mr. Grobstein.

Given the exploitation of the unconstitutional conduct at play here, suppression of the evidence in this case is the only just remedy available to the Court.

## V.   CONCLUSION

WHEREFORE, for the reasons discussed above, as well as in the original pleadings filed in this matter, Defendant Grobstein respectfully requests that the Court suppress all of the evidence obtained from the search of Mr. Grobstein's effects on the Greyhound bus on February 21, 2013.

Respectfully submitted,

ROTHSTEIN, DONATELLI, HUGHES,
   DAHLSTROM, SCHOENBURG & BIENVENU, LLP

By:   /s/ *Marc M. Lowry*
      MARC M. LOWRY
      MAGGIE H. LANE
      500 4th Street NW, Suite 400
      Albuquerque, NM 87102
      (505) 243-1443

*Attorneys for Matthew Isaac Grobstein*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 8th day of November, 2013 I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Paul Mysliwiec
Assistant United States Attorney

                       /s/  *Marc M. Lowry*
                     ROTHSTEIN, DONATELLI, HUGHES,
                         DAHLSTROM, SCHOENBURG & BIENVENU, LLP