IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

                                        Criminal No. 13-663 MV

   v.

MATTHEW GROBSTEIN,

       Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

       THIS MATTER comes before the Court on Defendant's Motion to Suppress [Doc. 44]. The Court, having considered the Motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion is not well-taken and will be denied.

**BACKGROUND**

       The Greyhound buses that travel east from California to New York have a stop, with a layover, at the Greyhound Bus Station in Albuquerque, New Mexico.  During that layover, those passengers continuing eastward disembark and wait in the terminal, while the bus is serviced, refueled, and cleaned in the maintenance shop, or "wash bay."  Once the bus is ready to depart, the bus returns to the terminal, and the passengers re-board to continue their journey.

       DEA Special Agent ("SA") Jarrell Perry works on drug interdiction cases at the Albuquerque Bus Station.  His goal is to determine if anyone is transporting illegal narcotics and, if possible, to arrest those individuals.  Doc. 85 at 36.  SA Perry has 17 years of experience with the DEA, and has been involved in over 1,200 cases involving the seizure of illegal narcotics or proceeds from illegal narcotics.  *Id.* at 34, 152.

1

In the late evening of February 21, 2013, assisted by Jonathan Walsh, an Albuquerque police officer who is assigned as a task force officer ("TFO") with the DEA, SA Perry was waiting at the Albuquerque Bus Station for the eastbound Greyhound Bus to make its regularly-scheduled stop.  He was wearing jeans and a sweatshirt, which concealed his gun and handcuffs. His badge was in a credential pouch in his left rear pocket.  *Id.* at 162-63.

The bus arrived and the passengers disembarked.  SA Perry boarded the bus, and rode the bus to the wash bay.  *Id.* at 46.  Video surveillance demonstrates that the bus arrived in the wash bay at 21:38:43; the driver exited the bus almost immediately; and SA Perry disembarked from the bus at 21:40:24. SA Perry thus was on the bus alone for one minute and 41 seconds.

After the bus arrived in the wash bay and before he disembarked, SA Perry was examining and looking at the bags in the bus.  *Id.* at 51-52 (SA Perry testified that he tries "to look all the bags in the locations and where they're located and what they look like").  It is SA Perry's customary practice, if he sees a bag that piques his interest, to lift it, sniff it, and/or look at the name tag.  *Id.* at 52.  Admittedly, he does "squeeze bags or press bags with [his] hands occasionally, if [he] see[s] something that piques [his] interest, to see if air emanating from it where [he] can conduct a sniff."  *Id.* at 52-53.  SA Perry testified that he did not press and sniff any of the bags inside the bus that evening.  *Id.* at 148.

After disembarking from the bus, at 21:40:34, SA Perry opened the bin closest to the back of the bus.  SA Perry appears to have been shifting bags inside the bin.  SA Perry leaned into the bin up to his waist, leaving only his body from the waist down visible to the camera; from the video recording, his hands cannot be seen.

At 21:42:25, SA Perry removed a bag from the bin.  From the video, he appears to have been examining the bag and its tag.  He then laid the bag down on the ground, got down on one knee, and while leaning over the bag, pushed on the sides of the bag.  While he is applying force to the sides of the bag, the bag slides forward, and SA Perry's hat falls off.  At 21:42:48, SA Perry returned the bag to the bin.

When asked, with regard to this portion of the video, "That's not a light push, is it?" SA Perry responded, "Yes my cap did come off."  *Id.* at 62.  When then asked, "But the luggage moved around as you pushed it because you pushed it so hard, isn't that correct?" SA Perry responded, "I would assume I got on my knee, because often it's wet in this area.  So I don't know if it moved because of me pushing it or because it's wet there.  Because they, as you can see, they dump the toilet there from other buses, and the area is often wet there."  *Id.*  SA Perry then testified as follows regarding his handling of the bag:  "I would say that I am pressing the sides of the bag to emanate the air from inside of it so I can sniff to see if any air emanates from the bag that I know from my experience will contain illegal narcotics or masking agents from illegal narcotics."  *Id.* at 63.

After returning the bag to the bin, SA Perry looked into the bin again, and his body was again obscured above the waist.  At 21:44:05, SA Perry walked away from the bin.  At 21:44:08, SA Perry opened the middle bin; it appears that he was shifting bags around inside the bin.  He closed the bin at 21:44:29.  At 21:44:34, he opened the bin closest to the front of the bus.  He leaned into the bin so that only his torso from the waist down is visible.  SA Perry testified that he was "moving bags" while leaning into the bin.  *Id.* at 64.  SA Perry closed the bin at 21:45:29, and walked out of the wash bay.

At 22:01:32, TFO Walsh entered the wash bay.  Video surveillance demonstrates that he opened the bin closest to the front of the bus, and used his flashlight to look inside.  TFO Walsh then moved to the bin closest to the back of the bus, looked inside using his flashlight, and pulled out a bag.  He pulled the handle up and down to see whether it was broken, because, he explained, "[m]any times, bags that have false compartments have broken handles . . ."  Doc. 86 at 17.  He then did something to the bag with his left hand.  Because of the angle of the camera, it is impossible to see his hands, but his upper body appears to have been moving upward and downward.  TFO Walsh then shook the bag and placed it on the ground, where he pressed the sides and pushed down on the top of the bag.  He then returned the bag to the bin, and closed both the front and back bins.  When asked about his handling of the bag, TFO Walsh testified that he "burped" the bag, or expelled air from the bag to conduct a sniff, and that he may have shaken the bag "in preparation for the burping."  *Id.* at 15.

At 22:04:10, TFO Walsh boarded the bus.  He remained alone on the bus for approximately two minutes, until 22:06:39, when he exited the bus back into the wash bay.  TFO Walsh testified that he could not recall whether he used the "burping" technique while he was inside of the bus, but that he did not "unzip bags."  *Id.* at 12, 16.

Meanwhile, after leaving the wash bay, SA Perry entered the terminal, although it is not his general practice to go inside the terminal.  Doc. 85 at 70.  At 21:48:40, SA Perry stopped and leaned against a pillar inside the terminal.  Defendant Matthew Grobstein was seated on a bench across from where SA Perry was standing.  SA Perry testified that he did not recognize Defendant, and that his purpose for standing there was to look at a television that is on the wall to the right of where Defendant was seated.  *Id.* at 72.  SA Perry walked away at 21:48:52.

4

SA Perry then walked over to the ticket counter where an individual whom he identified as "Daniel" was working. *Id.* at 73. Daniel is the "lead ticket agent," who was "the supervisor on duty." *Id.* at 126. SA Perry leaned on the counter to the right of Daniel and, looking straight ahead, began speaking with Daniel at 21:49:52. At 21:50:15, Daniel picked up the telephone and started dialing. SA Perry walked away at 21:50:25. SA Perry could not recall the substance of his conversation with Daniel but testified that it was "probably general conversation." *Id.* at 73.

Minutes later, at 21:52:43, SA Perry walked toward a security guard in the terminal, walked a bit past him, and then stood next to him. From the video recording, they appear to be speaking together; at one point, SA Perry made a gesture with his hand in the general direction of where Defendant was sitting, and the security guard turned to look in that direction. At 21:53:13, SA Perry walked away.

At some point thereafter, TFO Walsh joined SA Perry, and the two waited together for the bus to return to the terminal from the wash bay. *Id.* at 94. The bus arrived at 22:27:48; the driver disembarked and entered the terminal; and at 22:29:31, SA Perry and TFO Walsh boarded the empty bus, in advance of any of the passengers, and were on board for approximately five minutes before the passengers began boarding at 22:34:27. SA Perry testified that they were "waiting for the passengers to board so [they] could speak with them." *Id.* at 98. When asked whether he and TFO Walsh "re-examine[d] the bags that [they were] curious about," SA Perry responded, "No, sir." *Id.* The video recording shows little to no movement by the officers during the period while SA Perry and TFO Walsh were alone on the bus.

At 22:31:25, Daniel boarded the bus, and then disembarked from the bus 12 seconds later at 22:31:25. When asked whether Daniel conferred with SA Perry and TFO Walsh on the bus,

5

SA Perry responded, "I don't believe that's correct, no." *Id.* at 99.  Rather, he testified that from the video, it looked to him "that [Daniel] got on the bus and grabbed the tablet that's up by the driver and got right off the bus." *Id.* at 100.

The video demonstrates that at 22:32:25, the passengers began to line up to re-board the bus.  One of the passengers was Juan Braxton, whom TFO Walsh ultimately arrested later that night for a marijuana-related offense. *Id.* at 223.  The video further demonstrates that at 22:37:25, as Braxton reached the front of the line, Daniel left his desk, and as Braxton exited the terminal at 22:37:42, Daniel entered the line behind him.  Braxton boarded the bus, and Daniel boarded the bus behind him, at 22:37:05.  Daniel then exited the bus and ran back to the terminal at 22:39:02.

As Daniel reentered the terminal, Defendant was exiting the terminal to board the bus. Defendant held the door open for Daniel as they passed each other.  After speaking to the ticket agent, Daniel exited the terminal again.  Defendant boarded the bus at 22:39:16, and Daniel boarded the bus immediately after Defendant at 22:39:25.  Daniel remained in or around the bus, returning to the terminal at 22:50:23.

Meanwhile, at 22:39:16, as Defendant was walking from the terminal to the bus, SA Perry stood up from a seat near the rear of the bus and moved toward the center of the bus.  SA Perry testified that he was not "waiting for Mr. Grobstein," but rather was "waiting for all the passengers to board the bus, as [they] always do." *Id.* at 132.

Once the passengers began to board the bus, SA Perry and TFO Walsh began speaking to them.  TFO Walsh testified that he "starts at the middle portion of the bus and [he] speak[s] to passengers in the front half of the bus," and that SA Perry would start all the way in the rear of

the bus.  *Id.* at 227.  TFO Walsh further testified that he conducted "several consensual encounters with passengers on the bus," but could not "truthfully and honestly" "render an accurate number."  *Id.* at 225.  When asked whether he searched any passengers' bags on the bus that evening other than Braxton's bag, TFO Walsh responded, "If I remember correctly, I did, sir."  *Id.*

TFO Walsh recorded his encounters on his belt tape.  That recording demonstrates that TFO Walsh conducted three encounters on the bus:  the first was with a woman, and their conversation is barely audible on the belt tape; the second was with a man named Michael O'Beirne; and the last was with Braxton.  At the beginning of each of his encounters, TFO Walsh introduced himself as a police officer in Albuquerque.  *Id.* at 230.  When asked why he introduced himself that way, he responded that it is because he is, in fact, a police officer in Albuquerque.  *Id.*  TFO Walsh spoke throughout each encounter in a friendly, conversational tone.  *See also* Doc. 86 at 143-43 (passenger Michael O'Beirne described TFO Walsh as "unassuming" and polite).  Although he asked several questions of the first two passengers regarding their travel plans and their luggage, TFO Walsh did not search the bags of either of those passengers.  TFO Walsh described the first two encounters as "typical, normal traveling passengers that don't exhibit any indicators of someone that might be smuggling or hiding narcotics that, based on [his] training and experience, [he has] experienced."  *Id.* at 29.

On the other hand, TFO Walsh explained that unlike the first two passengers, Braxton "exhibited several external indicators of nervousness," which caused him to "focus [his] investigation there."  *Id.* at 29-30.  After asking Braxton several questions and learning that Braxton had no identification with him, was traveling with no more than a package in the

overhead rack and a pillow, and had a one-way ticket from Arizona to Oklahoma where he planned to stay for an undetermined amount of time with family, TFO Walsh advised Braxton that he was "working the bus for security purposes."  He then immediately asked Braxton whether he was traveling with any illegal weapons or illegal narcotics, such as methamphetamine, cocaine, marijuana, or heroin.  Braxton responded that he was not.  TFO Walsh then asked and received Braxton's consent to a search for these items.  TFO Walsh asked Braxton repeatedly whether the bag in the seat next to him was his; Braxton repeatedly said that it was not.  TFO Walsh searched the package and pillow that Braxton had identified as belonging to him, and then asked for and received consent to search Braxton's person.

TFO Walsh suspected that the bag in the seat next to Braxton was indeed Braxton's bag. After confirming with several questions that Braxton did not claim ownership of the bag, TFO Walsh asked the other passengers on the bus whether it was their bag.  When he inquired of O'Beirne, O'Beirne responded in a loud, annoyed tone, "I told you already, this is the only bag that I have."  Another passenger then stated that the bag belonged to the "guy back there," referring to Braxton.  After yet again asking Braxton about the bag, and Braxton telling him that the bag was not his, TFO Walsh searched the bag and found what he believed to be marijuana therein.  TFO Walsh advised SA Perry that Braxton had abandoned the bag, but that another passenger advised that the bag belonged to Braxton.   SA Perry told TFO Walsh to arrest Braxton and remove him from the bus, and then speak to the passenger who had seen Braxton with the bag in question.   TFO Walsh testified that he did not "have any prior knowledge of [Braxton's] bag," *id.* at 30, and more specifically, that he did not search Braxton's bag, or "burp" Braxton's bag while Braxton was off the bus.   *Id.* at 38, 41.

At that point, TFO Walsh returned to the bus.  One passenger, Justin Jackson, advised that he had seen Braxton sitting in the seat with the bag, and had seen him move the bag before walking off the bus when they arrived in Albuquerque.  O'Beirne then advised that he had been traveling with Braxton since Arizona, and that he saw Braxton board the bus with the bag.  When asked whether he would be willing to come back and testify, O'Beirne responded, "I guess so . . . the guy broke the law, that's the way it goes."

As TFO Walsh was conducting his encounters, SA Perry, too, was speaking with passengers on the bus, the last of whom was Defendant.  SA Perry testified that he ordinarily records his encounters with bus passengers.  Doc. 85 at 103.  He wears his recorder on a lanyard around his neck, concealed under his clothing.  *Id.* at 158.  On the night in question, he testified, he turned on his recorder and spoke with the first passengers, at one point indicating that he spoke with "approximately five to six passengers," *id.* at 103, but at another point, suggesting that he had spoken with only two passengers before the encounter with Defendant.  *See id.* at 155 (testifying that his initial encounters were with "both of the passengers in the rear of the bus").  He described those encounters as "normal," during which he asked where they were traveling to, where they were coming from, and whether they had any luggage with them.  *Id.* at 154.  SA Perry could not recall whether he asked each of the passengers whom he questioned to search their bags.  *Id.* at 115.

According to SA Perry, there then was "a delay in the amount of passengers that was coming on so [he] turned his recorder off," *id.* at 103, to save his battery, because sometimes his "battery will go dead because he [works] a lot of buses every day."  *Id.* at 155.  During the delay, SA Perry stood facing the back of the bus and made "casual conversation" with the passengers

already on the bus.  *Id.* at 156.  He then turned around to see if any of the other passengers were

boarding, and "made contact with [] Defendant."  *Id.*

At that point, SA Perry testified that he "turned back around and faced the rear of the

bus" to turn his recorder back on.  *Id.* at 158.  He "attempted" to turn the recorder back on by

pressing the button through his jacket, so that Defendant and the other passengers would not see

him doing it.  *Id.* at 150.  He did not actually succeed in turning it back on, perhaps because he

"hit the wrong button."  *Id.* at 103.  SA Perry testified that he "didn't realize the recording of the

defendant didn't happen until after he was arrested."  *Id.*  Once he realized that the recording did

not pertain to Defendant, he deleted his recording from that night, because he only "keep[s] the

recordings of when [he] make[s] a seizure from someone or make[s] an arrest or money seizure

from someone."  *Id.* at 106.  Accordingly, there is no recording of SA Perry's encounter with

Defendant on the bus that night.  SA Perry and Defendant provided different accounts of the

events leading up to Defendant's arrest, as follows.

*Defendant's Version of the Encounter*

According to Defendant, as he boarded the bus, "pretty much immediately" he saw TFO

Walsh speaking with Braxton.  Doc. 86 at 161.  Defendant testified that he "had to push past

Officer Walsh to get past him," but that it did not take very long to do so.  *Id.* at 161-62.  After

passing them, Defendant saw SA Perry "staring directly at [him]."  *Id.*  Defendant "ignored him"

and "walked to [his] seat."  *Id.*  As he was sitting down, SA Perry stopped him and told him that

he wanted to speak with him.  *Id.*  Defendant testified that SA Perry "may have patted [him] on

the shoulder."  *Id.*  Defendant told him that he would speak with him.  *Id.*

Defendant testified that SA Perry then "asked a lot of questions:  Where [he] was from, where [he] was traveling from, where [he] was traveling to."  *Id.*  SA Perry then asked for identification, and Defendant provided his passport, which was in a shopping bag on the seat next to his seat.  *Id.* at 162-63.  SA Perry then asked him "a few more questions before he asked [him] for consent to search [his] luggage."  *Id.* at 163.  When asked what he said in response to SA Perry's request for consent to search, Defendant responded, "I said, No."  *Id.*  SA Perry then asked, "Why," and "clarified his position that he was a police officer and that it was for security purposes."  *Id.*  Defendant then told SA Perry that he "had been searched before and that [his] things had been messed up, and [he] didn't want him to mess [his] things up."  *Id.*  SA Perry "replied that that was an unreasonable thing to say, that he never messed anyone's things up, and that [his] things would certainly not be messed up."  *Id.* at 164.  SA Perry was standing "within arm's length" of Defendant, and while he was not yelling, he was speaking in "a very insistent" and "manly tone" throughout the encounter.  *Id.*  According to Defendant, he said "no" "once or twice, maybe even three times, and [SA Perry] wouldn't listen to him."  *Id.* at 165.

When asked what ultimately happened, Defendant stated:  "I relented.  I didn't think that I had any other choice."  *Id.*  As a result, Defendant explained:  "I moved the bag down onto my seat.  It was standing face up, so I laid it down, and I unzipped it.  And then I opened it up.  I took my jacket out and I laid it over my [left] arm.  And I took a step back into the aisle again, and I motioned [with my right arm] for my bag, towards my bag."  *Id.*  When asked why he took his jacket out of his bag, Defendant responded, "I didn't want him to search it."  *Id.* at 166.

Defendant testified that SA Perry "poked through [his] bag for not very long," maybe ten seconds, and then asked for permission to search his person.  *Id.* at 166-67.  At that point,

11

Defendant explained, "I already felt like I didn't really have a choice.  So I didn't think that I could – he had already searched my bag, so I didn't think that I could say no. . . . I didn't think that he would have accepted [no] as an answer."  *Id.* at 167.  Defendant testified that there were "plenty of people" on the bus staring directly at [him]."  *Id.*

   *SA Perry's Version of the Encounter*

   SA Perry testified that, after his failed attempt to turn on his recorder, he turned around toward the front of the bus to face Defendant.  Doc. 85. at 162.  He and Defendant were both standing in the aisle, between the middle and the rear of the bus.  *Id.* at 164.  SA Perry displayed his badge to Defendant, returned his badge to his pocket, and identified himself as a police officer, which is how he has been introducing himself for almost 14 years.  *Id.* at 140, 164, 166.  When asked why he introduced himself as a police officer, rather than as a DEA agent, SA Perry stated that there are "a lot of people in the country" who "don't know what DEA is," but "pretty much everybody in society knows what a police officer is."  *Id.* at 141.

   SA Perry testified that he asked Defendant for permission to speak with him.  *Id.* at 166.  According to SA Perry, Defendant responded, "Sure."  *Id.*  SA Perry then asked whether he could see his bus ticket, and Defendant again responded, "Sure."  *Id.*  Defendant handed SA Perry his bus ticket, SA Perry reviewed it, saw that it was in the name of Matthew Grobstein, and returned it to Defendant.  *Id.* at 166-67.  SA Perry asked Defendant where he was traveling from; Defendant responded, "Oakland."  *Id.* at 167.  SA Perry then asked where he lived; Defendant responded, "New York."  *Id.*  SA Perry asked whether he had traveled by bus from New York to Oakland; Defendant responded that he had not, but rather had flown.  *Id.*

SA Perry testified that this response aroused his suspicion, as he has often seen drug couriers and/or money couriers who fly one way, and then return by either Amtrak train or Greyhound bus. *Id.* SA Perry then asked to see Defendant's identification. *Id.* at 170. Defendant provided his identification, which was in his correct name. *Id.* SA Perry reviewed the identification and returned it to Defendant. *Id.* at 171. SA Perry then asked Defendant how long he had been in California and whether it was for vacation; Defendant responded that he had been there for four days to visit friends. *Id.* at 172.

SA Perry then explained that "passengers had been spoken to before him, and passengers after him would be spoken to, because of the lack of security on the Greyhound bus." *Id.* SA Perry then asked if Defendant had any luggage with him, and Defendant pointed to a light blue, medium sized "rolling-type suitcase" directly to the right of him, in the empty window seat next to where he had been sitting. *Id.* SA Perry testified that there was nothing about Defendant's bag that had caught his attention prior to his encounter with Defendant and that, prior to securing Defendant's consent to search, he had not moved or touched Defendant's bag. *Id.* at 189.

SA Perry testified that he then asked Defendant if he would "voluntarily consent for [him] to search his suitcase for contraband, and Defendant responded, "Yeah," and then asked if he "was going to tear up any of the articles inside of his suitcase, to which SA Perry said, "No." *Id.* at 174. According to SA Perry, Defendant told him that, in the past, when his suitcase had been searched, "the people had either torn up his items or really messed up his clothing." *Id.* SA Perry testified that he "assured him that that would not happen in this case." *Id.* According to SA Perry, he only asked once for permission to search Defendant's bag. Doc. 86 at 211.

13

At that point, SA Perry testified, Defendant "picked up the suitcase," "placed it in the empty aisle seat that he was standing in front of," "unzipped it," "began to move the clothing around inside of it," and ultimately removed a black Adidas jacket, which he held in his right hand.  Doc. 85 at 174.  SA Perry further testified that Defendant then placed the jacket underneath his right arm and held it against his body, stepped back out into the aisle, and "motioned with his left hand, with his palm up towards the [open] suitcase."  *Id.*  SA Perry interpreted Defendant's hand gesture as a "nonverbal response to go ahead and search [his] bag." *Id.* at 176.

SA Perry testified that his "attention then went from the suitcase to the jacket."  *Id.* Accordingly, rather than search the bag, he asked Defendant "if he would voluntarily consent for [him] to search the jacket that he had just removed and was holding in his hand for contraband." *Id.*  According to SA Perry, Defendant "said yes, and [] handed [him] the jacket."  *Id.*

SA Perry estimated that the encounter with Defendant lasted less than two minutes.  *Id.* at 185.  He further testified that during the encounter, he spoke in a quiet tone, so as not to bring attention to other passengers, *id.* at 186, and that Defendant spoke in a normal, conversational tone without any sign of agitation until he was arrested.  Doc. 86 at 209.  SA Perry also stated that he did not make any threats, or display his firearm.  *Id.*

SA Perry testified that Defendant's bag had not caught his attention before Defendant indicated that it was his, and that he did not sniff, physically manipulate, or open it while he and TFO Walsh were alone on the bus, or at any time prior to securing Defendant's consent.  *Id.* at 189.  TFO Walsh similarly testified that he did not search Defendant's bag, or any other bags on the bus, prior to the passengers re-boarding the bus.  *Id.* at 38.

14

It is undisputed that ultimately, SA Perry discovered illegal narcotics in the interior lining of Defendant's jacket, and arrested Defendant based on that discovery. An Indictment was returned charging Defendant with possession with intent to distribute 50 grams and more of a mixture and substance containing methamphetamine in violation of 21 U.S.C. Sections 841(a)(1) and (b)(1)(B). Doc. 18. Defendant filed his instant motion to suppress, seeking suppression of (a) all physical evidence DEA agents seized from him on February 21, 2013, at the Greyhound bus station in Albuquerque, New Mexico; (b) all statements Defendant made to DEA agents on February 21, 2013; and (c) all evidence obtained directly or indirectly as a result of the evidence illegally seized from, and statements made by, Defendant. Doc. 44. The government opposes Defendant's motion.

The Court held a two-day evidentiary hearing on the motion, during which the Court heard testimony from, *inter alia*, Defendant, SA Perry, TFO Walsh, retired Greyhound employee James Dean, current Greyhound employee Jonathan Riley, and passenger Michael O'Beirne. Among the items admitted into evidence were video surveillance recordings of the Greyhound bus station on the evening of February 21, 2013, and an audio recording of TFO Walsh's encounters on the bus that evening. In addition, a transcript of SA Perry's OPR Interview was submitted to the Court for *in camera* review. At the conclusion of the hearing, the Court took Defendant's motion under advisement.

## DISCUSSION

Defendant argues that, on the night of February 21, 2013, SA Perry and/or TFO Walsh searched Defendant's belongings, targeted Defendant for a "consensual encounter" based on the results of that search, and after coercing Defendant's consent to search, "discovered" drugs in his

jacket that they already knew to be there.  Specifically, Defendant contends that the manner in which SA Perry and TFO Walsh manipulated the bags in the bins below the bus, as reflected in the video surveillance from the wash bay, constituted an unreasonable search in violation of the Fourth Amendment.  According to Defendant, the totality of the evidence leads to the inexorable conclusion that SA Perry and TFO Walsh engaged in at least the same manipulation of the bags inside the bus, if not the more egregious act of opening bags and searching them, during the periods when they were alone in the bus with no video surveillance, before the passengers re-boarded.

Defendant further contends that, based on what SA Perry and TFO Walsh learned from their search of Defendant's belongings, SA Perry targeted Defendant for questioning, thereby exploiting the illegality of the search to secure both Defendant's consent to search his belongings and Defendant's admissions.  Because his consent to search and his confession were tainted by the illegal search, Defendant's argument continues, the evidence found during SA Perry's search of Defendant's belongings and Defendant's statements must be suppressed as fruit of the poisonous tree.

Finally, Defendant argues that even if SA Perry and TFO Walsh did not illegally search Defendant's belongings before questioning him, the totality of the circumstances indicates that Defendant's consent to search was not voluntary.  For this reason alone, Defendant argues, the evidence discovered pursuant to the search of his belongings must be suppressed.

As described herein, Defendant has not established, by a preponderance of the evidence, that, prior to the encounter on the bus, SA Perry or TFO Walsh searched Defendant's belongings in violation of the Fourth Amendment.  Accordingly, neither Defendant's consent to search nor

his admissions were tainted by a prior illegality.  Also as described herein, the government has

established by a preponderance of the evidence that, under the totality of the circumstances,

Defendant's consent to search was voluntary.

I.      The Evidence Does Not Establish that Prior to His Encounter with SA Perry, Defendant's
        Bag Was Searched, and Thus Does Not Establish that Defendant's Fourth Amendment
        Rights Were Violated.

        In order to prevail on his motion to suppress evidence and statements as fruit of the

poisonous tree, Defendant "first must demonstrate that his Fourth Amendment Rights were

violated."  *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006), *cert. denied*, 550

U.S. 949 (2007).  Once he establishes the requisite Fourth Amendment violation, he then "must

also show a factual nexus between the illegality and the challenged evidence."  *Id.*(citation

omitted); *see also United States v. Mosley*, 743 F.3d 1317, 1232 (10th Cir.), *cert. denied*, 135 S.

Ct. 184 (2014) ("To suppress evidence as a fruit of his unlawful [search], a defendant must show,

first, that he was [searched] in violation of his Fourth Amendment rights, and second, that a

factual nexus exists between the unlawful [search] and the challenged evidence.") (citation

omitted).  "Only if the defendant has made these two showings must the government prove that

the evidence sought to be suppressed is not fruit of the poisonous tree."  *Mosley*, 743 F.3d at

1323.

        Here, Defendant argues that, prior to his encounter with SA Perry, SA Perry and/or TFO

Walsh searched his bag, without a warrant and without probable cause, and thus in violation of

his Fourth Amendment Rights.  As Defendant acknowledges, there is no video recording

showing SA Perry and/or TFO Walsh in the act of searching Defendant's bag.  Similarly, there is

no testimony that SA Perry and/or TFO Walsh searched Defendant's bag.  To the contrary, SA

Perry and TFO Walsh unequivocally testified that neither of them searched Defendant's bag, either by touching the outside of the bag or by opening the bag.

According to Defendant, however, there is enough *other* evidence to lead to the logical conclusion that Defendant's bag must have been searched before SA Perry approached him on the bus. In other words, Defendant contends that the Court should infer from the totality of the evidence that SA Perry and/or TFO searched Defendant's bag in violation of his Fourth Amendment rights. Further, Defendant argues that the sum of these inferences need not be weighed against SA Perry and TFO Walsh's testimony, as their testimony is not credible. As set forth herein, the Court does not find that the inferences Defendant seeks to draw from the evidence are sufficient to meet his burden of demonstrating the requisite Fourth Amendment violation.

A.     The Inspection of Bags Stored in the Cargo Bins below the Bus.

Defendant first argues that the inference that SA Perry and/or TFO Walsh searched his bag can be drawn from the fact that, as demonstrated by the video recording, they illegally searched bags stored in the cargo bins below the bus. Defendant further argues that, because they are "drug interdiction officers, they must have handled the bags inside the bus with the same treatment shown in the wash bay video." Doc. 105 at 9. The Court is not convinced that it would be proper to infer, from evidence that they earlier illegally searched another passenger's bag, that SA Perry and/or TFO Walsh illegally searched Defendant's bag. The Court need not determine this issue, however, as Defendant has not established, as a predicate matter, that SA Perry and/or TFO Walsh illegally searched any bags on the night in question.

1.     The Law on Searches

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "A traveler's luggage is one of the many 'effects' protected by the Fourth Amendment."  *United States v. Hill*, 805 F.3d 935, 937 (10th Cir. 2015).  "Subject to limited exceptions, a search [] conducted without a warrant is presumptively unreasonable."  *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014) (citing *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).  The Supreme Court has clarified that Fourth Amendment violations may be established by applying either a property-based theory or a reasonable expectation of privacy theory.

Under the "traditional property-based understanding of the Fourth Amendment," "[a] search occurs when the Government acquires information by 'physically intruding on persons, houses, papers, or effects.'"  *Ganias*, 755 F.3d at 133 (quoting *Florida v. Jardines*, __ U.S. __, 133 S. Ct. 1409, 1414 (2013)).  In *Jardines*, the Supreme Court applied this standard to hold that "using a drug-sniffing dog on a homeowner's porch, the officers had undoubtedly entered the home's *curtilage* – that is, the "area immediately surrounding and associated with the home" that is treated "as part of the home itself for Fourth Amendment purposes."  *Id.* at 1414 (citation omitted).  Because "the officers' investigation took place in a constitutionally protected area," it was a search implicating the Fourth Amendment, unless the officers had license, explicit or implicit, to gather information there.  *Id.* at 1415.  The Court concluded that the officers lacked such permission because "the background social norms that invite a visitor to the front door do not invite him there to conduct a search."  *Id.* at 1416.

19

Under the reasonable expectation of privacy test, "[a] search occurs when the Government acquires information by . . . invading an area in which the individual has a reasonable expectation of privacy." *Ganias*, 755 F.3d at 133 (citing *Katz v. United States*, 389 U.S. 347, 360-61 (1967)); *see also United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998). It is the defendant's burden to demonstrate "a subjective expectation of privacy that society is prepared to recognize as reasonable." *Nicholson*, 144 F.3d at 638; *see also United States v. Johnson*, No. 07-30955, 2008 WL 3876550, at *2 (5th Cir. Aug. 21, 2008), *cert. denied*, 555 U.S. 1118 (2009) ("The defendant bears the burden of establishing a reasonable expectation of privacy by a preponderance of the evidence.").

In applying the reasonable expectation of privacy test, the Tenth Circuit has held that "[t]ravelers have a legitimate expectation of privacy in their personal luggage, which the Fourth Amendment protects." *Nicholson*, 144 F.3d at 638. Nonetheless, the Court clarified, "not every investigative technique which reveals something about the contents of a traveler's luggage constitutes a search within the meaning of the Fourth Amendment." *Id.* In particular, "the use of sensory perception does not necessarily constitute a search," and, accordingly, an agent's "touching of a bag's exterior does not necessarily constitute a search." *Id.* at 636-37. Rather, it is "[t]he degree of intrusion that is the determining factor as to whether an officer's contact with the exterior of luggage constitutes a search under the Fourth Amendment." *Id.* at 639.

In *Nicholson*, the detective testified that he removed Defendant's carry-on bag from the overhead rack and "manipulated" it. As a result, he detected "tightly wrapped bundles" inside the bag, which he believed to be illegal drugs. The Tenth Circuit found that because the manner of the detective's manipulation of the bag was one that "Defendant did not reasonably expect

from other passengers," the detective conducted a search within the meaning of the Fourth

Amendment. *Id.* at 639. Specifically, the Court noted:

> Detective Leach was not prepping the bag for a sniff. He never testified that he
> smelled Defendant's bag. Instead, Detective Leach worked Defendant's bag to
> determine whether it contained something of independent evidentiary value.
> Unlike a sniff, manipulating a bag with the hands may reveal much more than
> simply the likely presence of illegal drugs. To an extent, it reveals the contents of
> a bag, for example clothes, shoes, or toiletries, in which the owner has a
> legitimate expectation of privacy.

*Id.* The Court reached the following conclusion:

> We believe that by handling Defendant's carry-on bag in this manner, Detective
> Leach departed from the type of handling a commercial bus passenger would
> reasonably expect his baggage to be subjected, and entered the domain protected
> by the Fourth Amendment. When Detective Leach removed Defendant's carry-
> on bag from the overhead rack and conducted a tactile examination aimed at
> discovering the nature of the contents of the bag, he violated Defendant's
> reasonable expectation of privacy in the bag. Thus, Detective Leach's manner of
> handling Defendant's carry-on bag constituted a search within the meaning of the
> Fourth Amendment.

*Id.*

The Court similarly found that another detective's manner of handling the defendant's

checked suitcase in the cargo hold of the bus constituted a search, where the detective testified

that he pressed on the sides of the bag "with his hands perpendicular to the ground and flat." *Id.*

at 640. By pressing on the sides, the detective detected "several large bundles" inside it. The

Court found that "Detective Wenthold's pressing on the sides of the suitcase with the palms of

his hands in order to inspect its contents violated Defendant's reasonable expectation of privacy

in the suitcase because it went beyond that type of contact which a passenger may reasonably

expect when checking a bag with a commercial bus line." *Id.* at 640.

Similarly, in *Bond v. United States*, 529 U.S. 334, 336 (2000), an agent entered a bus, and squeezed the soft luggage in the overhead storage space above the seats as he walked from the back of the bus to the front.  In particular, the agent squeezed the petitioner's green canvas bag and noticed that it contained a brick-like object, which later was revealed to be methamphetamine.  The Supreme Court held that the agent's physical manipulation of the petitioner's bag violated the Fourth Amendment.

First, the Court found that, by his conduct, the petitioner had "exhibited an actual expectation of privacy . . . by using an opaque bag and placing that bag directly above his seat." *Id.* at 338.  Next, the Court considered whether the petitioner's "expectation of privacy was one that society is prepared to recognize as reasonable."  *Id.*  The Court explained that "[w]hen a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another.  Thus, a bus passenger clearly expects that the bag may be handled."  *Id.*  Nonetheless, the Court continued," [h]e does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner."  *Id.*  This, the Court found, "is exactly what the agent did here."  *Id.* at 339.  Accordingly, the Court held "that the agent's physical manipulation of petitioner's bag violated the Fourth Amendment."  *Id.*

2.     <u>Application of the Law to the Instant Case</u>

Defendant argues that SA Perry and TFO Walsh each manipulated a bag stored in the cargo bins below the bus in violation of the Fourth Amendment, under both the property-based theory and the reasonable expectation of privacy theory.  In support of this argument, Defendant points to the video recording that shows SA Perry remove a bag from the bin closest to the back of the bus, lay it down on the ground, get down on one knee, and while leaning over the bag,

22

push on the sides of the bag.  While he is applying force to the sides of the bag, the bag slides

forward, and SA Perry's hat falls off.  Similarly, Defendant points to the video recording that

shows TFO Walsh remove a bag from the same bin, pull the handle up and down, do something

to the bag with his left hand that, because of the angle of the camera, cannot be discerned, but

involves an upward and downward motion, shake the bag, place it on the ground, and press the

sides and push down on the top of the bag.  When asked about their handling of these particular

bags, both SA Perry and TFO Walsh testified that they were not trying to discern the contents of

the bags with their hands, but rather were pressing and/or shaking the bags in order to expel air

and prepare the bags for "a sniff" for the scent of illegal narcotics or masking agents.  According

to Defendant, this explanation is not credible, and even if it were, the degree of force with which

they pressed the bags – regardless of the purpose for which they engaged that degree of force –

constitutes a Fourth Amendment violation.

  First, under the property-based theory, Defendant argues that, by "using brute force to

expel air out of an individual's luggage," SA Perry and TFO Walsh obtained information by

physically intruding on a constitutionally protected area, namely, a traveler's luggage or "effect,"

and thus conducted a search of that luggage.  Doc. 105 at 21.  The Court is not convinced that

SA Perry and TFO Walsh's handling of the bags is the sort of physical intrusion on a personal

effect that was envisioned by the Court in *Jardines*.  While the officer in *Jardines* entered

boundaries of the defendant's porch, neither SA Perry nor TFO Walsh penetrated the boundaries

of the passenger's luggage.  By pressing down with their hands on the outside of the bags, they

did not physically enter the bags.  The video does not show either SA Perry or TFO Walsh open

the bags, or breach their sides.  Defendant has provided no authority, and the Court has found

none, holding that briefly compressing, without breaching, the sides of a passenger's luggage constitutes a "physical occupation" or "physical intrusion" as described in *Jardines*. *See United States v. Taylor*, No. 14-cr-65, 2015 WL 856840, at *5-6 (S.D. W. Va. Feb. 27, 2015) (holding that detective's squeezing of a package in an attempt to feel its contents did not constitute a search under *Jardines*).

Next, under the reasonable expectation of privacy theory, Defendant argues that, regardless of their purpose in applying force to the bags, SA Perry and TFO Walsh felt the bags in "an exploratory manner" that went beyond the type of contact that a passenger may reasonably expect when checking a bag with a commercial bus line. According to Defendant, even taking as true the government's position that SA Perry and TFO Walsh were prepping the bags for a sniff, such conduct is prohibited by *Bond*, as passengers do not expect others to try to discern what is inside their bag by touching the exterior or by squeezing it to smell the contents therein.

In support of this argument, Defendant cites to *United States v. Ellis*, in which the Fifth Circuit held that a border patrol agent violated the Fourth Amendment by extending an immigration stop to conduct a search for drugs, after the lawful immigration purpose of the stop had terminated. 330 F.3d 677 (5th Cir. 2003). In the case before it, the agent "would remove a piece of luggage from the overhead bin, "squeeze it 'all the way around' to check for soft spots, and sometimes smell it." *Id.* at 678. In reaching its decision, the Fifth Circuit affirmed the district court's finding that the agent's practice of "squeezing and sniffing" a passenger's bags for drugs, without individualized suspicion, constituted an illegal search. 330 F.3d 677, 679-81 (5th Cir. 2003). The Court noted that, "[a]fter *Bond []*, the squeezing and sniffing methodology took on constitutional significance." *Id.* at 681.

24

In its opposition to Defendant's motion, the government insists that SA Perry and TFO Walsh did not "physically manipulate bags," but rather squeezed and sniffed bags.  According to the government, this squeeze and sniff practice does not violate the Fourth Amendment, "because the law allows officers to sniff bags and to handle bags as a transit baggage handler would."  Doc. 99 at 15.  Specifically, the government contends, "[p]ressing a bag to circulate air, and sniffing that air, is not using a sense of touch to determine what is inside the bag."  *Id.* at 16.

The government does not provide, and the Court has not found, any authority to support the bright-line distinction that it draws between "using a sense of touch" to feel the contents of a bag, and using that very same "sense of touch" to expel air from a bag.  Indeed, there is nothing in the language of *Bond* to support such a distinction.  Similarly, while the Tenth Circuit in *Nicholson*, a decision predating *Bond*, noted that the officer "was not prepping the bag for a sniff," 144 F.3d at 639, it did not equally opine as to whether such prepping would be constitutional, and if so, whether that too, would depend on the amount of force used.   Notably, the Court distinguished "manipulating a bag with the hands" from a sniff itself, not from preparation for a sniff by touching or squeezing a bag.  *Id.*  Squeezing a bag in preparation for a sniff, if forceful enough, will "reveal[] the contents of a bag, for example clothes, shoes, or toiletries, in which the owner has a legitimate expectation of privacy."  *Id.*  It seems only logical, then, that the "squeezing and sniffing methodology" takes on "constitutional significance."  *Ellis*, 330 F.3d at 681.

The Court thus rejects the government's theory that there is a constitutionally significant distinction between squeezing a bag in preparation for a sniff, on the one hand, and squeezing a bag to discern the contents of the bag, on the other hand.  Physical manipulation of a bag, by any

other name, remains physical manipulation of a bag.  Rather, this Court determines that under *Bond* and *Nicholson*, regardless of the purpose for which an officer uses his or her sense of touch to feel the outside of a passenger's luggage, the relevant inquiry remains whether the officer "feel[s] the bag in an exploratory manner" that goes beyond the passenger's expectation of how that bag may be handled by other passengers or bus employees.  *Bond*, 529 U.S. at 339.  It is the "degree of intrusion" that matters.  *Nicholson*, 144 F.3d at 639.

In the instant case, it is undisputed that SA Perry and TFO Walsh both used their hands to press the outside of bags that they removed from a cargo bin below the bus.  What is not clear is the degree to which they intruded on the bag when doing so.  Defendant argues that the level of force is obvious, because the bags slid forward; SA Perry testified that the floor was wet and slippery, thus providing an equally plausible cause of the bags' movement.

It is not possible to discern from the video whether SA Perry or TFO Walsh felt the bags in an exploratory manner that went beyond the bag owners' expectation of how their bags might have been handled by other passengers or bus employees.  It is equally likely that SA Perry and TFO Walsh stopped short of applying the sort of pressure to the bags that would have revealed the contents of the bags.  Accordingly, the video does not establish, by a preponderance of the evidence, that either SA Perry or TFO Walsh conducted a search of the bags.  Assuming *arguendo* that it would be proper for the Court to infer, from evidence of their search of a bag stored beneath the bus, that the officers searched a bag inside the bus, because no search of a bag stored beneath the bus can be discerned from the video, no inference of a search inside the bus can be drawn from the video.

B.    Testimony of Greyhound Employees

Defendant also argues that the inference that SA Perry and/or TFO Walsh searched his

bag can be drawn from the fact that two Greyhound employees testified that they have seen SA

Perry search bags.   First, James Dean, a retired Greyhound employee who worked for five years

as a "coach server" servicing buses in the Albuquerque bus station wash bay, Doc. 86 at 46-47,

presented testimony that during his tenure at Greyhound he had seen SA Perry unzip bags and

look through them, both inside the bus and in the cargo bins below.  *Id.* at 49, 57.  His testimony

was confused regarding whether he observed SA Perry on the night of February 21, 2013, and if

so, whether he saw him open any bags.

Specifically, when asked on direct examination whether he had any independent

recollection of working on February 21, 2013, Dean responded, "Not offhand."  *Id.* at 50.  On

cross-examination, Dean first testified that he did not remember whether he saw SA Perry open

bags on February 21, 2013, *id.* at 57, then testified that he did not remember the night of

February 21, 2013, *id.* at 58, and then testified that on the night of February 21, 2013, he "didn't

see [SA Perry] inside the bus that night," as he was outside the bus, "servicing the bus outside."

*Id.* at 60.  Further, Dean first testified that SA Perry "might have" opened bags that he removed

from the cargo bins, *id.* at 61, but when then asked whether SA Perry did "that to any bags on

February 21st that [Dean] saw him pull out of the cargo area of the bus, Dean responded, "Yes,"

*id.*, and ultimately responded "Yes" when asked whether his best recollection was that he "saw

[SA Perry] look inside someone's bag from the cargo area of the bus on February 21st."  *Id.* at

62.

As the government notes, the wash bay video recording from the night of February 21, 2013, shows that SA Perry did not open any of the bags that he removed from the cargo bins below the bus.  Accordingly, it appears that Dean became so confused on cross-examination that his ultimate recollection of what he saw on the night in question was not accurate.  Despite any confusion in his testimony, however, Dean did not waver from his testimony that he did not see SA Perry open any bags inside the bus on the night of February 21, 2013.

Next, Jonathan Riley, who has worked as a "service worker" for four years at Greyhound servicing buses in the Albuquerque bus station wash bay, testified that he has observed DEA agents, including SA Perry and TFO Walsh, remove bags from the cargo bins and aggressively and forcefully touch and feel those bags with their palms.  Doc. 86 at 66-72.  Riley further testified that he has "witness[ed] the same procedure of [DEA agents] touching bags inside the bus."  *Id.* at 73.  Riley also testified that he has witnessed SA Perry open bags and go through them, both inside and outside of the bus.  *Id.* at 82-83.

Riley testified about three specific instances.  First, he testified that on the morning of January 17, 2013, while on the bus, he saw SA Perry pick up a black duffle bag, unzip it, and remove three wooden bears, two of which had whole fish in their mouths, and one of which had half of a fish in its mouth.  *Id.* at 74-75.  Riley testified that SA Perry asked him, "What would you think this would be?" and Riley responded, "Probably drugs."  *Id.* at 75.  According to Riley, SA Perry put the bears back into the bag.  *Id.*  After the bus had returned to the terminal, Riley testified, he saw SA Perry with another detective, a journeyman mechanic at Greyhound named Nick Baca, and an individual in handcuffs walking toward the wash bay.  *Id.* at 76.  He then saw

SA Perry handcuff the individual to a seat, drill into the bear that he had seen earlier with half of a fish in its mouth, and use a lab kit to test the contents of the bear for drugs.  *Id.* at 77.

Next, Riley testified that on a morning in March 2013, he observed SA Perry and another DEA agent he knew as "Kevin" pull an instrument case out from one of the cargo bins of the bus and open the case, where they found little baggies, which they also opened.  *Id.* at 78.  Riley testified that he heard Baca tell the agents that he had seen the same case on the bus the day before.  *Id.*  The agents returned the baggies to the case, closed the case, and returned it to the bin.  *Id.* at 79.  Riley further testified that after the bus had returned to the terminal, he observed an individual handcuffed to a seat with the instrument case next to him.  *Id.*

Finally, Riley testified that on the morning of August 11, 2013, while he was cleaning inside the bus, he heard or saw SA Perry "re-zipping up a bag real fast."  *Id.* at 81.  When asked whether it was his perception that SA Perry was trying to hide what he was doing from him, Riley responded, "Yes."  *Id.* at 98.

Riley testified that on February 21, 2013, he worked the morning shift from 4:00 am to 12:00 pm.  *Id.* at 127.  During that shift, Riley testified that he saw SA Perry, and observed him touch bags in the cargo bins of the bus, but did not observe him open any bags.  *Id.* at 126-127.  Riley was not at the bus station on the evening in question, namely, when the bus on which Defendant was travelling stopped in Albuquerque.  *Id.* at 127-28.

The government adamantly argues that Riley's testimony should be discredited, both because it is inaccurate and because it is motivated by animus toward Greyhound, the DEA, and SA Perry in particular.   Admittedly, Riley was incorrect about the dates on which he observed drug seizures by SA Perry.  The incident with the wooden bears occurred on December 14, 2012,

rather than on January 17, 2013, and the incident with the long box that appeared to be an instrument box, but was actually a scooter box, occurred on November 12, 2012, rather than in March of 2013. Riley's memory thus is not as precise as he presented to the Court. *Id.* at 86 (describing his memory for dates as "God bless, God given"). Further, SA Perry testified that he did not unzip the bag with the bears, but rather the bag was partially open, and thus the bears were in plain sight. *Id.* at 190.

Nonetheless, the Court does not agree that Riley revealed a strong personal bias, or that the government has provided any valid basis for the Court to discredit Riley's testimony in its entirety. Indeed, Riley was forthcoming in testifying that he did not see SA Perry or any other officer open any bags on the date in question, February 21, 2013, and further accurately recalled that he was not present at the bus station on the *night* of February 21, 2013.

The Court is deeply troubled by the possibility that, as Riley and Dean each testified he witnessed, on occasions other than February 21, 2013, SA Perry opened bags in violation of the law. While DEA agents are tasked with interdicting drug traffickers, they are equally tasked with performing their duties within the bounds of the law, regardless of whether there are security cameras or eyewitnesses to record and recollect their activities. As it pertains to the instant case, however, it is clear that neither Dean nor Riley observed SA Perry or TFO Walsh search Defendant's bag. As set forth in detail below, in light of the totality of the evidence, Dean and Riley's testimony is insufficient to establish by a preponderance of the evidence that SA Perry and/or TFO Walsh searched this Defendant's bag.

C.      Evidence that SA Perry Targeted Defendant for Questioning

Defendant further argues that the evidence establishes that Defendant was targeted for questioning, and that the evidence of targeting in turn creates the inference that SA Perry and/or TFO Walsh searched his bag.

1.      The Video of SA Perry's Activities and Daniel's Activities

In support of his argument that the evidence shows that he was targeted, Defendant points to the video recording of SA Perry's activities and Daniel's activities, which he describes as follows.  After SA Perry completed his inspection of bags inside and below the bus, he entered the terminal (although that is not his usual practice), stopped and leaned against a pillar inside the terminal that was directly across from where Defendant was seated and "stare[d] straight at him."  Doc. 105 at 23.  SA Perry then spoke with Daniel, talking to him "while facing the wall, as if not to draw attention to himself or to Daniel," *id.* at 25, after which Daniel called someone on the telephone.  Next, SA Perry spoke with a security guard, standing "as if not to draw attention to their conversation," *id.*, and during their conversation, gestured in the general direction of where Defendant was sitting.  After boarding the bus, SA Perry sat near the rear of the bus, and only stood up and moved forward when Defendant began approaching the bus to board.  Further, while SA Perry and TFO Walsh were alone on the bus, Daniel boarded and then disembarked 12 seconds later.  Daniel then entered the line of passengers boarding the bus directly behind Braxton (who was also subsequently arrested for possession of illegal narcotics).  After boarding the bus behind Braxton, Daniel returned to the terminal, only to enter the line again, this time directly behind Defendant.  After boarding the bus after Defendant, Daniel again disembarked from the bus.

From this video recording, Defendant concludes that SA Perry entered the terminal with the purpose of finding Defendant, and that once he found Defendant, he conferred with Daniel and the security guard about Defendant.  Defendant further concludes that, because he was assisting SA Perry with his drug interdiction efforts, Daniel ran onto the bus to confer with SA Perry and TFO Walsh before the passengers boarded, and then corralled Braxton and Defendant onto the bus, to ensure that SA Perry and TFO Walsh would have the opportunity to question them.  From all of this, Defendant argues, the logical inference is that, while he was aboard the bus alone before entering the terminal, SA Perry had searched Defendant's belongings, found the illegal narcotics concealed in the lining of his jacket, and found Defendant's passport with his photograph, thus enabling him to spot Defendant in the terminal.

While Defendant's interpretation of the video may be plausible, there is no basis for the Court to determine that it is more likely than not an accurate description of what transpired. First, SA Perry testified that when he entered the terminal, he did not recognize Defendant, and that in fact he was not staring at Defendant while leaning on the pillar across from him, but rather was standing there to look at a television on the wall to the right of where Defendant was seated.  From the Court's own viewing of the video, it appears that SA Perry's testimony is equally if not more plausible than Defendant's interpretation.

Nor is it clear from the video that SA Perry's gesture, made in the general direction of where Defendant was seated, was actually a gesture specifically identifying Defendant.  Indeed, there is no other indication that the security guard to whom SA Perry was speaking was involved in the encounter or arrest of Defendant.

32

With regard to Daniel's involvement in Defendant's questioning and ultimate arrest, SA Perry testified that he does not get information from Daniel, and that, although he could not recall the substance of his conversation with Daniel at the ticket counter, it was probably general conversation.  Doc. 85 at 73; *see also* Doc. 86 at 222 (when asked whether Daniel provided him with the passenger manifest that he appeared to be reviewing, TFO Walsh testified that Daniel has never provided him with a passenger manifest).  While Defendant calls into question the telephone call that Daniel placed after speaking with SA Perry, there is no evidence that the call was tied to Defendant in any way.  Further, SA Perry denied that Daniel entered the bus to confer with him, but rather, from his viewing of the video, testified that it looked to him "that [Daniel] got on the bus and grabbed the tablet that's up by the driver and got right off the bus."  Doc. 85 at 100.  Again, based on its own viewing of the video, SA Perry's interpretation seems equally if not more plausible than Defendant's interpretation.

While Daniel's boarding of the bus behind Braxton and Defendant is undoubtedly puzzling, its significance is not readily apparent from the video.  Without any other indication that Daniel was assisting SA Perry and TFO Walsh, the Court cannot find that is more likely than not that Daniel was intentionally herding those particular individuals onto the bus for the benefit of SA Perry and TFO Walsh.  As the government notes, Defendant did not subpoena Daniel as a witness, and the Court thus is left with nothing but Defendant's supposition that Daniel was assisting SA Perry and TFO Walsh that night.  Given the testimony to the contrary, the Court cannot infer, as Defendant requests, that Daniel was involved in his arrest.

Finally, as Defendant contends, it does appear that SA Perry's movement toward the front of the bus coincided precisely with Defendant's re-boarding of the bus.  This timing

33

however, is as credibly explained by SA Perry's testimony as it is by Defendant's theory that SA Perry targeted Defendant. Specifically, SA Perry testified that there was a delay in the re-boarding process, and that he was making casual conversation with passengers who had already boarded at the time when Defendant boarded. At that time, he testified, he moved forward to make contact with Defendant.

For all of these reasons, the Court does not find by a preponderance of the evidence that the video recording of SA Perry's activities and Daniel's activities demonstrates that Defendant was targeted for questioning. It follows that the Court cannot draw the inference that while he was aboard the bus alone before entering the terminal, SA Perry had searched Defendant's belongings and identified him for targeting.

> 2.    Encounters with Defendant and Braxton

In further support of his argument that the evidence shows that he was targeted, Defendant notes that he and Braxton were the only passengers with whom SA Perry and TFO Walsh "meaningfully engaged." Doc. 108 at 12. While Defendant and Braxton were the only passengers whose bags were searched and who were arrested, the Court does not agree that this fact demonstrates that they were targeted.

As demonstrated by TFO Walsh's belt recording, he conducted three encounters on the bus, the last of whom was Braxton. TFO asked basically the same travel-related questions of all three passengers, in the same friendly, conversational tone. Admittedly, TFO Walsh did not search the bags of either of the first two passengers he encountered. TFO Walsh, however, explained that this was because those passengers did not exhibit any indicators of someone that might be smuggling or hiding narcotics that, based on [his] training and experience, [he has]

experienced." Doc. 86 at 29. On the other hand, TFO Walsh explained that Braxton did, in fact, exhibit "several external indicators of nervousness," which caused TFO Walsh to "focus [his] investigation there." *Id.* at 29-30. Further, after a brief period of questioning, TFO learned that Braxton had no identification with him, was traveling with no more than a package in the overhead rack and a pillow, and had a one-way ticket from Arizona to Oklahoma where he planned to stay for an undetermined amount of time with family. Based on those answers, TFO Walsh asked for Braxton's consent to search. After that point, it appears that TFO Walsh did not conduct any further encounters because he spent the remainder of the time that the passengers were re-boarding trying to locate the owner of the unclaimed bag which, after a search, revealed illegal narcotics and which, after questioning of the other passengers on the bus, TFO Walsh determined to belong to Braxton.

Based on the audio recording, in conjunction with TFO Walsh's credible testimony, it does not appear that TFO Walsh targeted Braxton. There was nothing untoward about his encounter with Braxton, his "meaningful engagement" with Braxton was reasonably based on what he discovered during the course of that encounter, and Braxton was arrested because TFO Walsh discovered illegal narcotics in his bag.

There is no similar audio recording of SA Perry's encounters on the bus. SA Perry at first testified that he spoke with "approximately five or six passengers" but then later suggested that he had spoken with only two passengers before the encounter with Defendant. SA Perry described those initial encounters as "normal," during which he made travel-related inquiries. He could not remember whether he asked any of those passengers for permission to search their bags.

35

Defendant argues that because SA Perry was inconsistent regarding the number of passengers whom he questioned, and because, during re-boarding, before Defendant entered the bus, SA Perry remained near the rear of the bus "near the first two passengers," rather than moving up to the front half of the bus, where the next 11 passengers who boarded were seated, the necessary conclusion is that SA Perry was lying in wait for Defendant. While admittedly SA Perry's testimony was not consistent, his inability to recall the precise number of passengers whom he questioned does not necessarily lead to the conclusion that Defendant seeks to draw.

As TFO Walsh testified, he remained in the front of the bus while SA Perry remained in the back, and their customary practice was for SA Perry to question passengers from the middle of the bus to the back, while TFO Walsh questioned passengers from the front of the bus to the middle. Doc. 85 at 227. Defendant's own description of the video is that, before he boarded, only two passengers were in the back of the bus, and that SA Perry remained near them. This is consistent with SA Perry's testimony that he spoke with the first two passengers on the bus and made casual conversation with them while he waited for additional passengers to board. If the next 11 passengers remained in the front portion of the bus, as Defendant states, it makes sense that SA Perry did not question them, as TFO Walsh was charged with questioning the passengers in the front of the bus.

Further, Defendant has not presented evidence that he was, in fact, the only passenger with whom SA Perry "meaningfully engaged" or from whom SA Perry asked permission to search. Indeed, even if there were such evidence, there are valid reasons why SA Perry might have chosen to request permission to search from Defendant, and not from other travelers, depending on how they answered his initial travel-related inquiries. Finally, as noted above, the

fact that SA Perry moved toward the middle of the bus precisely when Defendant re-boarded the bus is as credibly explained by SA Perry's testimony as it is by Defendant's theory that SA Perry targeted Defendant.

For all of these reasons, the Court does not find by a preponderance of the evidence that the officers' engagement with, search of, and ultimate arrest of Defendant and Braxton, even in the absence of any documented search and arrest of other passengers on the bus, demonstrate that Defendant was targeted for questioning.  It follows that the Court cannot draw the inference that while he was aboard the bus alone, SA Perry searched Defendant's belongings.

3.      Testimony of Passenger Michael O'Beirne

Finally, in support of his argument that the evidence shows that he was targeted, Defendant refers to the testimony of passenger Michael O'Beirne.  In particular, O'Beirne testified that when he boarded the bus, he saw two officers who appeared to be "stationed" in specific areas, scrutinizing "a specific area," and "looking for someone or something," which he assumed to be drugs.  Doc. 86 at 138.  In particular, O'Beirne felt that "there was a focus on a particular bag and the people that were in the general area."  *Id.* at 139.   O'Beirne testified that by his observation, SA Perry and TFO Walsh "knew what they were looking for and where it was. . . . They just needed to put a face to the area."  *Id.* at 152.

To be sure, O'Beirne's testimony establishes that it appeared to him that SA Perry and TFO Walsh were interested in matching a particular bag to its owner, most likely Braxton's bag, as O'Beirne was sitting near that bag.  TFO Walsh, however, routinely asked passengers to identify their luggage.  It is not clear from O'Beirne's testimony whether TFO Walsh was focused on Braxton's bag before the passengers started to re-board, or whether his focus turned

37

to that bag when he realized that no one seated near the bag had claimed ownership of it. Further, it is apparent from his loud, annoyed tone that O'Beirne was displeased that TFO Walsh asked him more than once whether the unclaimed bag was his.

While sufficient to establish that he perceived that the officers were focused on one bag in one area, O'Beirne's testimony is not equally sufficient to establish that SA Perry and TFO Walsh had targeted Defendant and Braxton before they boarded the bus.  Further, even assuming that his testimony did establish such targeting, there is no basis to draw the second, necessary, inference that SA Perry and TFO Walsh targeted Defendant and Braxton *based on an illegal search of their bags*.  O'Beirne's testimony is too thin a reed on which to base such an inferential leap.

> D.    There Is No Basis to Discredit SA Perry and TFO Walsh's Testimony.

Defendant argues that the inference that SA Perry "pre-searched" Defendant's bag need not be weighed against SA Perry and TFO Walsh's testimony to the contrary.  In support of that argument, Defendant contends that their "incredible testimony" proves their unreliability, and that SA Perry's "multiple past transgressions cast doubt on his testimony."  Doc. 108 at 6, 9, 21.

First, Defendant points to SA Perry's inconsistent testimony, discussed above, regarding the number of passengers with whom he conducted consensual encounters.  Defendant contends that this inconsistency demonstrates that SA Perry is willing "to say whatever necessary."  *Id.* at 7. The Court does not find this inconsistency to carry such significance.  In the absence of an audio recording, which undisputedly would have made this case easier for all involved, it seems entirely reasonable that SA Perry would not remember the exact number of passengers with whom he spoke before his encounter with Defendant.  SA Perry made no arrests or seizures

based on those other encounters, and thus they were likely not particularly memorable for him. Nor did he have any reason to believe that the number of encounters he conducted would have relevance in the future.  As noted above, SA Perry has been working in interdiction for 17 years; it is not surprising that at the time of the hearing he was unable to recall the number of encounters he conducted on one evening of that long career.  Accordingly, the Court does not find that SA Perry's inability to remember whether he spoke with two, five, or six passengers prior to speaking with Defendant calls into doubt the remainder of his sworn testimony.

Next, Defendant notes that TFO Walsh inaccurately recalled, both when he wrote his incident report and when he testified, that he boarded the bus after the re-boarding process began, while, in contrast, the video recording demonstrates that he and SA Perry boarded the bus minutes *before* the first passenger re-boarded.  Again, the Court does not find that this inconsistency carries much weight.  Whether TFO Walsh boarded the bus before or after the first passengers is not relevant to the issue here, namely whether Defendant's bag was pre-searched. Further, when he was questioned about the discrepancy, TFO Walsh explained that his understanding is that the boarding process begins once the bus has returned to the terminal from the wash bay and Greyhound employees begin lining passengers up to board.  There was nothing dissimulating about TFO Walsh's testimony.

Similarly, Defendant notes that TFO Walsh inaccurately testified that he conducted several encounters that involved searching passengers' bags, when in fact his belt tape conclusively demonstrates that he searched no bags other than Braxton's bag.  Defendant's characterization overstates the definitiveness of TFO Walsh's testimony.  TFO Walsh testified that he conducted "several consensual encounters with passengers on the bus," but could not

"truthfully and honestly" "render an accurate number."  Doc. 85 at 225.  When asked whether he searched any other passengers' bags on the bus that evening, TFO Walsh responded, "If I remember correctly, I did, sir."  *Id.*  Rather than providing an answer "designed to deflect any appearance of targeting" Defendant or Braxton, Doc. 108 at 9, based on the qualification that he provided – "If I remember correctly . . ." – it appears that TFO Walsh was attempting to answer the question to the best of his recollection.  In the Court's estimation, TFO Walsh appeared to answer questions truthfully, to the best of his recollection.  The inconsistencies identified by Defendant do not rise to the level of dissimulations that call into question the reliability of the remainder of his sworn testimony.

Finally, Defendant argues that SA Perry's "dishonest behavior and inconsistent testimony in other past cases similarly cast doubt on his testimony in this case."  *Id.* at 21.  Specifically, Defendant cites to *United States v. Rangel*, in which the Tenth Circuit found that SA Perry's DEA-6 report contradicted his testimony at the preliminary hearing regarding a tip that he had received.  519 F.3d 1258, 1260 (10th Cir. 2008).  The defendant asked the Court to allow him to have a hearing in the district court "to establish that the government knowingly relied on perjured testimony by SA Perry in securing his conviction at trial."  *Id.* at 1265.  The Tenth Circuit decided that, because the defendant raised a "substantial question about the integrity of the government's prosecution," this was one of the "highly unusual case[s]" where a motion for relief under 28 U.S.C. § 2255 was appropriate while an appeal from the conviction was pending. *Id*.  The Court thus abated the appeal in order to allow the defendant to pursue relief under § 2255 in district court.  *Id.* at 1266.  The defendant pleaded guilty before the district court could hear the perjury issue.

As a result of the Tenth Circuit's decision, the Office of Professional Responsibility of the U.S. Department of Justice and the DEA each conducted an investigation into SA Perry's conduct in connection with his investigation in *Rangel*.[1]  Doc. 85 at 151.  The DEA concluded that SA Perry failed to exercise proper attention to duty, and he was given a day off without pay. *Id.*  The DEA did not make any specific finding as to whether SA Perry had been dishonest.  *Id.*

Defendant also cites to *United States v. Vaughn*, No. 11 Cr. 1235 MCA (D.N.M. Jan. 7, 2013), Doc. 98, in which, as discussed more fully below, the Court granted the defendant's motion to suppress on the basis that SA Perry coerced the defendant's consent to search.  *Id.* at 20.  In particular, the Court found that SA Perry failed to inform the defendant that he was searching for illegal narcotics, and instead informed her "that he was searching for weapons and/or explosives," to which either the defendant or her co-defendant "indicated that she felt reassured that law enforcement was being vigilant to protect their safety."  *Id.* at 23.  Further, in evaluating the evidence before it, the Court noted that it would not credit the testimony of SA Perry to the extent that such testimony differed from its own review of the audio recording and to the extent that it was based not on SA Perry's recollection, but rather on an after-the-fact notes that he had written on the transcript of the audio recording of the encounter.  *Id.* at 13-14.  It appears, however, that SA Perry made those notes at the direction of the government attorney, and that the government attorney withdrew the annotated transcript before the motion was decided.

---

[1] The Court has reviewed *in camera* the transcript of SA Perry's interview with OPR.  Based on its review of that transcript, in addition to its review of the transcript of the hearing in this matter, the Court determines that the transcript of the OPR interview is not subject to discovery as either *Brady* material or *Jencks* material.

41

Undeniably, the specter raised by *Rangel* that SA Perry committed perjury is concerning. Equally concerning is SA Perry's conduct as found in *Vaughn*, in particular the ease with which he misrepresented his purpose and his position in order to more easily secure consent to search. Nonetheless, nothing in either *Rangel* or *Vaughn* reflects so strongly on SA Perry's credibility as to warrant the wholesale rejection of his testimony in this matter, given under oath. The Court found SA Perry to be a credible witness, who appeared to testify truthfully and to the best of his recollection. In light of the Court's own observations of SA Perry, neither *Rangel* nor *Vaughn* provides a sufficient basis to dismiss SA Perry's otherwise credible testimony in determining whether Defendant has met his burden of establishing that his Fourth Amendment rights were violated in this case. *See United States v. Calderon-Gonzales*, No. CR 12-1240 JP (D.N.M. June 27, 2013), Doc. 60 at 11 (holding that *Rangel* and *Vaughn*, although "somewhat disconcerting," did not, in themselves, "necessarily provide a sufficient reason for disbelieving Perry's testimony concerning relevant facts," in the case before it).

E.   The Sum of the Inferences that Defendant Seeks to Draw Does Not Equal
     Evidence Establishing the Requisite Fourth Amendment Violation.

Taken together, the inferences that Defendant seeks to draw from the evidence are insufficient to establish, by a preponderance of the evidence, that SA Perry and/or TFO Walsh searched Defendant's bag before SA Perry's encounter with Defendant. As described in detail above, the video recording from the wash bay does not establish that SA Perry and/or TFO Walsh searched any of the bags stored beneath the bus. Similarly, the video recording of SA Perry's activities and Daniel's activities does not establish that Defendant was targeted for questioning, and neither SA Perry's engagement with Defendant, nor TFO Walsh's engagement with Braxton, establishes that Defendant or Braxton was targeted for questioning. Further,

O'Beirne's testimony does not establish that SA Perry and TFO Walsh targeted Defendant and Braxton based on an illegal search of their bags.

The Court thus is left with the testimony of Dean and Riley that, on occasions other than February 21, 2013, they witnessed SA Perry search bags. This testimony, while deeply troubling, is insufficient alone to establish by a preponderance of the evidence that SA Perry and/or TFO Walsh searched Defendant's bag. Indeed, to find to the contrary would be to allow evidence of other bad acts to take the place of direct – or circumstantial – evidence that SA Perry and/or TFO Walsh engaged in the alleged bad acts that form the basis for the instant motion. In light of SA Perry and TFO Walsh's credible testimony that they did not search Defendant's bag, it would be improper for the Court to make the inferential leap that because there is evidence that SA Perry searched bags on other occasions, he searched Defendant's bag on this occasion.

Accordingly, the Court cannot infer from the totality of the evidence that SA Perry and/or TFO Walsh searched Defendant's bag in violation of his Fourth Amendment rights. Because Defendant thus has failed to meet his burden of establishing a Fourth Amendment violation, he has equally failed to establish that his consent and statements were tainted by a prior illegality. It follows that there is no basis to suppress as fruit of the poisonous tree either the evidence discovered pursuant to the search of Defendant's belongings or his statements.

II.     The Evidence Establishes That Defendant's Consent to Search Was Voluntary.

Defendant argues that, regardless of whether his consent to search followed a Fourth Amendment violation, the totality of the circumstances demonstrates that his consent was not freely, voluntarily, and expressly given. According to Defendant, the involuntary nature of his

consent to the search of his belongings provides a separate, independent basis for suppression of the evidence discovered pursuant to his consent to search and his subsequent statements.

A.    The Law on Voluntariness

Warrantless searches are presumptively unreasonable, subject to "a few carefully established exceptions," including voluntary consent to search. *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). The government bears "the burden of proving that consent is given freely and voluntarily." *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012) (citation omitted). Voluntariness of consent "is a factual issue, determined through the totality of the circumstances." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).

"[F]or consent [to search] to be valid" the Tenth Circuit requires that: "'(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) the government must prove consent was given without duress or coercion, express or implied.'" *Guerrero*, 472 F.3d at 789 (quoting *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992)). *See also Jones*, 701 F.3d at 1317 ("Voluntary consent consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given.") (internal quotation marks omitted).

In order to meet the first prong of the voluntariness requirement, "a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications so long as they are sufficiently comprehensible to a reasonable officer." *Guerrero*, 472 F.3d at 789-90. Notably, an officer is not "required to inform a defendant explicitly that he is free to go before requesting permission to search, . . . or to refrain from renewing his request for consent after a defendant has at first declined it." *Id.* at 790; *see also*

44

*United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001) (holding that the fact that

appellant initially told the officer that he could not search his car did not render his subsequent

consent involuntary).  Further, the Tenth Circuit has "specifically held that non-verbal consent

may validly follow a verbal refusal."  *Guerrero*, 472 F.3d at 790.

When evaluating whether consent given in the confines of a bus, as it was here, is free of

coercion under the second prong of the voluntariness test, the relevant inquiry is "whether a

reasonable person would feel free to decline the officers' requests or otherwise terminate the

encounter."  *United States v. Bostick*, 501 U.S. 429, 436 (1991).  In *Bostick*, the Court deemed

the following factors relevant to the Fourth Amendment reasonableness determination:  (1)

whether the agent advised the defendant that he had the right to refuse consent, (2) whether the

agent in any way threatened the defendant (*i.e.*, the display of a weapon and/or the nature of the

questioning), and (3) the particular location of the encounter.  *Id.*  Following *Bostick*, the Tenth

Circuit similarly identified various factors relevant to whether a reasonable person would not feel

free to terminate an encounter with police, and thus whether consent was free of coercion:

> The threatening presence of several officers; the brandishing of a weapon by an
> officer; some physical touching by an officer; use of aggressive language or tone
> of voice indicating that compliance with an officer's request is compulsory;
> prolonged retention of a person's personal effects such as identification and plane
> or bus tickets; a request to accompany the officer to the station; interaction in a
> nonpublic place or a small, enclosed place; and absence of other members of the
> public.

*United States v. Hill*, 199 F.3d 1143, 1147-48 (10th Cir. 1999), *cert denied*, 531 U.S. 830 (2000).

Courts also may consider "whether an officer indicated to the person that he is free to leave."

*Jones*, 701 F.3d at 1313.  The Tenth Circuit has stressed that "no single factor is dispositive, and

this list is not exhaustive."  *Id.*

In *United States v. Drayton*, the Supreme Court applied the *Bostick* framework to the facts of the case before it and determined that the respondents' consent to the search of their luggage and their persons was voluntary, explaining:

> Nothing Officer Lang said indicated a command to consent to the search.  Rather, when Lang requested to search Brown and Drayton's persons, he asked first if they objected, thus indicating to a reasonable person that he or she was free to refuse.  Even after arresting Brown, Lang provided Drayton with no indication that he was required to consent to a search.  To the contrary, Lang asked for Drayton's permission to search him ("Mind if I check you?"), and Drayton agreed.

563 U.S. 194, 206 (2002).

The Court specifically noted that although the officer "did not inform the respondents of their right to refuse the search, he did request permission to search, and the totality of the circumstances indicates that their consent was voluntary, so the searches were reasonable."  *Id.* at 207.  The Court rejected not only the notion that "police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search," but also the suggestion that "a presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate."  *Id.*  Rather, the Court stated that "the totality of the circumstances must control, without giving extra weight to the absence of this type of warning."  *Id.*

B.      Application of the Law to the Instant Case

Defendant argues that the circumstances of his encounter with SA Perry establish that he did not voluntarily consent to the search of his belongings.  As an initial matter, there is no recording of the encounter, and thus no definitive evidence of the actual words spoken or the tone used by either party during encounter.  The government goes to great lengths to convince

46

the Court that Defendant's testimony regarding the encounter is not credible.  The Court is not convinced.

The Court finds that Defendant was a credible witness, that there was nothing "irreconcilably contradictory" about his testimony, and that Defendant's "personal interest" in the outcome of his motion is insufficient to demonstrate that he committed perjury.  Doc. 99 at 5-8.  In light of Defendant's credibility, in combination with SA Perry's failure to record the encounter, the Court will credit Defendant's recollection of events, to the extent that his recollection differs from that of SA Perry.  To the extent that Defendant did not provide his own version of events to which SA Perry testified, the Court will credit SA Perry's recollection of events, as the Court found him a credible witness.  As set forth herein, even accepting Defendant's version of events as accurate, the Court finds that his consent to the search of his belongings was voluntary.

First, Defendant's consent to SA Perry's search of his bag and then his jacket was "unequivocal and specific and freely given."  *Guerrero*, 472 F.3d at 789.  Although Defendant initially refused SA Perry's request for consent to search his luggage, and said no "once or twice, maybe even three times," he ultimately, and within the space of less than two minutes, consented to the search of his bag by moving it down onto his seat, laying it down, unzipping it, and motioning with his right arm toward his bag.  Although Defendant removed his jacket from the bag and held it over his left arm before gesturing to SA Perry to search the bag, when SA Perry next asked for permission to search his person, and in particular, his jacket, Defendant said yes, and handed SA Perry the jacket.

Thus, with regard to his bag, Defendant gave clear consent by opening his bag and gesturing toward it.  With regard to his jacket, Defendant gave clear consent by handing it to SA Perry.  This consent was not rendered involuntary by the fact that SA Perry asked for permission a second or even third time after Defendant originally responded "No," when first asked for consent to search, as an officer is not required to "refrain from renewing his request for consent after a defendant has at first declined it."  *Id.* at 790; *see also Zubia-Melendez*, 263 F.3d at 1163. Moreover, non-verbal consent, such as Defendant's opening of and gesturing to his bag and giving SA Perry his jacket, "may validly follow a verbal refusal."  *Guerrero*, 472 F.3d at 790. Accordingly, the first prong of the voluntariness requirement is met.

Second, Defendant's consent was "given without duress or coercion, express or implied." *Id.* at 789.  Specifically, applying the *Hill* factors, the government has met its burden of demonstrating that a reasonable person in Defendant's position would have felt free to decline SA Perry's request to search or otherwise terminate the encounter.

First, there was no "threatening presence of several officers."  To the contrary, the only officers on the bus were SA Perry and TFO Walsh.  Only SA Perry approached Defendant, near the middle of the bus, while TFO Walsh remained at the front of the bus.  Until Defendant was actually in handcuffs, TFO Walsh was not involved in the encounter between Defendant and SA Perry.

Defendant, however, argues that this factor militates against a finding of voluntary consent because there were "multiple" officers on the bus, Defendant was aware of their presence immediately upon boarding the bus, Defendant had to push past TFO Walsh to walk back to his seat, and during his encounter with SA Perry, Defendant was aware of what was

48

going on with Braxton's arrest.  First, the presence of two officers is insufficient to establish the threatening presence of "several" officers.  *See United States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012) (finding first factor did not weigh against a finding of voluntary consent where only two police officers were present at the scene and only one of those officers approached defendant).  Similarly, that Defendant was immediately aware of the officers' presence upon entering the bus and had to push past one of them is a function not of the officers' actions but rather of the fact that they were in the relatively small, enclosed space of a bus, with narrow aisles.  Indeed, Defendant was able to get past TFO Walsh, and it did not take him very long to do so.  Further, TFO Walsh's belt tape demonstrates that there was nothing threatening about the way he conducted his encounter with Braxton, or with any of the other passengers.  Accordingly, the first factor militates in favor of a finding of voluntary consent.

Second, neither SA Perry nor TFO Walsh "brandished" a weapon.  Rather, SA Perry and TFO Walsh kept their guns and handcuffs concealed beneath their clothing.  Third, with regard to physical touching by an officer, as he approached Defendant to speak with him, SA Perry "may" have patted Defendant on the shoulder.  While it thus is possible that SA Perry engaged in "some physical touching," this sort of "brief" contact, which was described neither as "forceful" nor 'aggressive," is insufficient to tip the balance against a finding of voluntary consent.  *See id.* (finding third factor did not weigh against a finding of voluntary consent where trooper physically touched defendant because the contact was brief and neither forceful nor aggressive).

Fourth, while Defendant described SA Perry's tone of voice as "very insistent" and "manly," he testified that SA Perry did not yell or form his requests to search in the imperative.  Rather, Defendant clarified that felt that SA Perry was "insistent" because he asked repeatedly

for consent to search.  This testimony falls short of establishing that SA Perry used "aggressive language or tone of voice" indicating that Defendant's compliance with his request to search was "compulsory."

With regard to the fifth and sixth factors, SA Perry did not retain Defendant's personal effects for a prolonged period of time, but rather returned to Defendant his passport and ticket after reviewing them, and did not ask Defendant to accompany him to the DEA office.

With regard to the seventh factor, while the encounter occurred in public, the space in which it occurred was the small, enclosed space of a bus.  As a result of the spatial limitations of the bus, during the encounter, SA Perry, who is taller and heavier than Defendant, was standing within arm's length of Defendant.  Defendant was confined to the cramped, narrow aisle of the bus, and TFO Walsh, standing at the front of the bus, was blocking the aisle, as evidenced by boarding passengers who had to say, "excuse me," "can I get past you," to reach their seats. Accordingly, the seventh factor weighs against a finding of voluntary consent.

With regard to the eighth and final factor, the encounter occurred in the presence of other members of the public, namely, the other bus passengers.  Indeed, Defendant testified that there were "plenty of people" on the bus watching his encounter with SA Perry.

While the small, enclosed space of the bus limited Defendant's movement and thus reasonably would have affected his perception of whether he was free to terminate the encounter with SA Perry, that factor alone is not enough to tip the balance toward finding that Defendant's consent was coerced.  Rather, under all of the circumstances here, as evidenced by the totality of the relevant factors, SA Perry's conduct would not have conveyed to a reasonable person that

"he was not free to decline SA Perry's requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439.

In disputing the voluntary nature of his consent, Defendant first argues that by representing that he was a police officer on the bus for "security purposes," rather than disclosing that his real purpose was to discover illegal narcotics, SA Perry engaged in a coercive tactic that weighs against a finding of voluntary consent. Indeed, "deception and trickery are among the factors that can render consent involuntary." *Harrison*, 639 F.3d at 1278. Specifically, "[w]hen government agents seek an individual's cooperation with a government investigation by misrepresenting the nature of that investigation, this deception is appropriately considered as part of the totality of circumstances in determining whether consent was gained by coercion or duress." *Id.* at 1278-79. The court is counseled to be "especially cautious when this deception creates the impression that the defendant will be in physical danger if he or she refuses to consent to the search." *Id.* at 1279. Notably, however, "not all deception or trickery will render a search invalid." *Id.* at 1278.

In support of his position, Defendant cites to *United States v. Vaughn*, No. 11 Cr. 1235 MCA (D.N.M. Jan. 7, 2013), Doc. 98. In that case, the Court determined that the defendant's consent to SA Perry's request to search was invalid because it was obtained through implied or express duress or coercion. *Id.* at 20. In reaching that decision, the Court considered a number of factors, including the fact that SA Perry failed to inform the defendant that he was searching for illegal narcotics, and instead informed her "that he was searching for weapons and/or explosives," to which either the defendant or her co-defendant "indicated that she felt reassured that law enforcement was being vigilant to protect their safety." *Id.* at 23. The Court found that

this comment indicated that the defendant was "less inclined to refuse Perry's questioning and his varying requests to perform searches in light of his stated purpose." *Id.* The Court thus determined that SA Perry's "misrepresentation weigh[ed] in favor of the conclusion that Defendant's consent for the pat down was obtained through coercion." *Id.*

The Court agrees that by identifying himself as a police officer, rather than as a DEA officer, and by representing that he is there for security purposes, without clarifying that his purpose is drug interdiction, SA Perry misled and misinformed Defendant. The Court is troubled by SA Perry's obfuscation of his position and his role. Nonetheless, unlike in *Vaughn*, SA Perry here did not further misrepresent that he was searching for weapons and/or explosives, and thus did not mislead Defendant into believing that he was there only to conduct "anti-terrorism work." Doc. 105 at 38. Accordingly, unlike in *Vaughn*, there is no reason to believe that Defendant was less inclined to refuse SA Perry's questioning and his repeated requests for consent to search in light of his vague and ambiguous description of his purpose as "security." *See United States v. Villaba*, No. CR 13-0664 JB, 2013 WL 4782206, at *29-30 (D.N.M. Aug. 21, 2013) ("Villaba may have felt more patriotic by complying with Walsh's request to search his bag for security purposes, as opposed to a search for law enforcement purposes, but the fact remains that he consented to the search.").

Further, nothing in SA Perry's misrepresentation created the impression that Defendant would be in physical danger if he refused to consent. Nor did SA Perry's statement that he was a police officer present on the bus for security purposes reasonably convey to Defendant that he was not free to decline SA Perry's requests. *See id.* Accordingly, in this case, SA Perry's

misrepresentation, although a relevant factor for consideration, viewed within the totality of the circumstances, does not tip the balance in favor of finding coerced consent.

Defendant also argues that the persistence with which SA Perry pursued Defendant's consent to search coerced his consent. Doc. 105 at 39. As Defendant states, "[a]ccusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one." *United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 1026 (2003). As in *Ringold*, however, here there is no evidence that SA Perry's questioning of Defendant "reached that level of implied coercion." *Id.* First, nothing about SA Perry moving forward on the bus to speak with Defendant, staring directly at him as he boarded, or asking him "a lot of [travel-related] questions" was coercive. A voluntary encounter is not transformed into a coercive one "simply because a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434 (1991). Similarly, although SA Perry did not accept "no" for an answer when Defendant indicated that he did not want his luggage searched, there is no evidence that SA Perry then engaged in "accusatory, persistent, or intrusive questioning." Rather, he asked the reason for Defendant's refusal, and then responded that Defendant's reason – not wanting his stuff messed up – was "unreasonable," and promised not to mess his things up. There is no indication that SA Perry "worded or delivered" his response to Defendant's initial refusal to consent to search "in such a manner as to indicate that compliance with any officer directives (or even inquiries) was required." *Ringold*, 335 F.3d at 1174. As noted above, while SA Perry's repeated requests for permission to search may have been "persistent," he was not also accusatory or intrusive with his questioning. Similarly, while he

used an "insistent" and "manly" tone, there is no evidence that he "displayed an intimidating or coercive demeanor." *Id.*

Again, Defendant argues that this case is analogous to *Vaughn*, where the Court found that the defendant's consent was coerced, in part as a result of SA Perry's "persistent, intrusive, and coercive" questioning.  No. 11 Cr. 1235 MCA, Doc. 98 at 21.  In *Vaughn*, however, the Court based its findings on facts that are non-existent here.  In particular, the Court found that during his initial interaction with the defendant, SA Perry used a "friendly, congenial, and conversational" tone, and then ended that encounter, ostensibly to search the defendant's luggage.  *Id.*  Although the defendant that believed the encounter had come to an end, less than three minutes later, SA Perry returned with a second officer.  *Id.*  During the second encounter, the Court stated, SA Perry's "demeanor changed."  He was no longer friendly, congenial, and conversational.  Instead, he spoke to Defendant . . . in a quick, terse, and business-like manner."  *Id.*  Further, the Court explained, without any preamble, SA immediately asked to search the woman which whom the defendant was traveling, Henderson.  As the Court states, "After clarifying what he meant by the word 'person,' Perry asked for a second time whether Henderson would consent to a search of her person.  Before Perry could even finish his request or Henderson could reasonably formulate a response, the second officer interjected that she was 'gonna pat [Henderson] down' and proceeded to subject Henderson to a pat down search."  *Id.*  The Court observed that

> Perry previously had dealt with Defendant and Henderson collectively throughout his interactions with the women.  He asked them the same questions and subjected the women to the same searches.  When Defendant witnessed the pat down search of Henderson, a search to which Henderson did not have the opportunity to object or consent, Defendant could reasonably conclude that she too had no choice but to submit to a pat down search.

*Id.* For these reasons, the Court determined that "by the time Perry asked to search Defendant's person, after multiple objections by Defendant and/or Henderson, Perry's questioning had become persistent, intrusive, and coercive." *Id.*

In contrast, in the instant case, there was only one encounter, which lasted less than two minutes, during which SA Perry's friendly tone and demeanor did not change. There was only one officer conducting the encounter, and Defendant did not witness SA Perry or TFO Walsh conduct a pat down search of any other passenger, let alone a passenger who had no opportunity to consent to the search. Accordingly, *Vaughn* is distinguishable from the instant case and thus does not provide a basis for concluding that, during his encounter with Defendant, SA Perry engaged in "accusatory, persistent, or intrusive questioning" of the sort that reasonably would have coerced Defendant's consent.

Admittedly, Defendant testified that he felt intimidated, that he believed SA Perry would not listen to him or take "no" for an answer, and that he ultimately "relented" because he thought that he had no true choice but to consent. Nothing about SA Perry's actual conduct, however, reasonably conveyed that he would not accept Defendant's refusal to consent. As discussed above, Defendant gave his consent within two minutes of the beginning of the encounter; in the interim, SA Perry engaged in no use of the coercive *Hill* factors. Instead, he tried to assuage Defendant's concerns about his belongings being messed up, and renewed his request to search. In light of the evidence regarding the circumstances of the encounter, Defendant's testimony that he merely "relented" because the search appeared inevitable is insufficient to establish that his consent was coerced. *See Hill*, 199 F.3d at 1150 (While Mr. Hill's "subjective state of mind" regarding police officers "may be relevant to some degree to the issue of the voluntariness of

55

[his] consent," . . . in this case, it does not overcome the other indicia that Mr. Hill's consent was freely and voluntarily given.") (citation omitted); *Guerrero*, 472 F.3d at 790 (finding unpersuasive defendant's contention that his consent was given under duress, indicating that he was "just being submissive because . . . [the officer] was going to search the car anyways," where, based on the relevant factors, a reasonable person would have felt free to leave or deny the officer's request); *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993) (refusing to find coercion where defendant argued that, although he initially may have believed he could refuse consent, the officers' repeated requests for consent caused him to break down and allow the officers to search him, given the defendant's "steadfast exercise of that right with respect to [a] package," despite repeated requests for consent to search that package).

Finally, Defendant argues that SA Perry's failure to advise Defendant of his right to refuse SA Perry's request to search weighs strongly against the voluntariness of his consent. Admittedly, SA Perry did not inform Defendant of his right to refuse consent to search. As discussed above, however, the Supreme Court in *Drayton* made clear that an officer is not required to inform citizens of the right to refuse consent to search, and that no presumption of invalidity attaches where such information is not provided. Indeed, the Court stated that no "extra weight" is to be given to the absence of this type of warning, and that instead, the totality of the circumstances control. 536 U.S. at 201.

Here, as in *Drayton*, SA Perry requested permission to search, rather than commanding consent to search through his actions, tone, or words. *See id.* As discussed above, while SA Perry did repeat his request for permission to search, a reasonable person would not have

interpreted SA Perry's repeated requests to indicate that he would not take "no" for an answer. The totality of the circumstances thus indicates that Defendant's consent was voluntary. *See id.*

Defendant acknowledges *Drayton* but argues that it does not apply here, where Defendant's encounter with SA Perry was not random, as was the encounter in *Drayton*, but rather was orchestrated by SA Perry, based on his earlier search of Defendant's bag, in order to allow him to "find" the drugs that he already knew were hidden in Defendant's jacket. As discussed above, Defendant has not established that the encounter between SA Perry and Defendant was preceded by a search of Defendant's bag. Accordingly, Defendant's attempt to distinguish *Drayton* is unavailing.

> As the Tenth Circuit noted in *Ringold*,
>
> It might perhaps be contended that all of this is unduly formalistic and does not give sufficient play to the natural tendency of any person – the wholly innocent individual as well as someone transporting contraband – to feel somewhat cowed when a law enforcement officer approaches and begins to ask questions, particularly those probing into the possibility of illegal activity. But even apart from the difficulties that a more restrictive approach would pose for entirely legitimate law enforcement efforts, it is too late in the day – the law is too firmly established – to convert that notion into a more demanding test for the legality of a noncustodial encounter with an officer.

335 F.3d at 1174.

Under the totality of the circumstances, SA Perry's conduct would not have conveyed to a reasonable person that he was not free to decline SA Perry's request for permission to search Defendant's belongings, or otherwise terminate the encounter with him. The government thus has met its burden of demonstrating that Defendant's consent was given without duress or coercion and, accordingly, has satisfied the second prong of the voluntariness requirement. Because the government has established that Defendant's consent was given freely and

voluntarily, it necessarily follows that there is no basis to suppress either the evidence discovered pursuant to the search of Defendant's belongings or his statements.

## CONCLUSION

Defendant has not met his burden of establishing that either SA Perry or TFO Walsh conducted a search of his belongings in violation of the Fourth Amendment.  The government has met its burden of establishing that Defendant's consent to the search of his belongings was freely and voluntarily given.  Accordingly, there is no basis to suppress either the evidence discovered pursuant to the search of his belongings or his statements.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress [Doc. 44] is denied.

Dated this 7th day of March, 2016.

_____
**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**